H. A. CLARK *et al.* V. LIZZIE ALLAMAN *et al.*

No. 13,851. (80 Pac. 571.)

SYLLABUS BY THE COURT.

1. COMMON LAW—*Its Prevalence in Kansas Prior to 1868.* From the time of their acquisition by the United States until 1868 the common law was prevalent over the separate portions of the region from which the state of Kansas was erected, under all civilized forms of governmental organization established for them; and from 1855 until 1868 the common law, not inconsistent with the constitution of the United States, the Kansas-Nebraska act, or statute law, was the rule of action and decision, any law, custom or usage to the contrary notwithstanding.

2. —— *Rights of Riparian Owners.* The rules of the common law relating to the rights of riparian owners to use the water of running streams were adapted to the conditions and wants of the early settlers of the territory and state of Kansas, and no usages or customs to the contrary were recognized or established by them.

3. —— *Statute of 1868 Continued Existing Law.* At the time of the enactment of the statute of 1868 continuing in force the common law as modified by constitutional and statutory law, judicial decisions, and the conditions and wants of the people, the rules of the common law relating to the rights of riparian owners to use the water of running streams had become incorporated into, and were a part of, the settled jurisprudence of the state.

4. —— *Not Repealable by Local Customs.* By the enactment of the statute of 1868 the settled law of the state relating to the rights of riparian owners to use the water of running streams did not become exposed to repeal by local customs to the contrary, nor by judicial recognition of such customs.

5. IRRIGATION—*Statute Required to Change Established Principles.* Without statutory authority this court has no power to recognize or enforce in a limited section of the state new rules of law relating to the use of the water of running streams antagonistic to established principles of law already in force throughout the entire state.

6. —— *Local Customs.* Evidence cannot be received of local customs contrary to established principles of law.

7. —— *No Right of Prior Appropriation before 1886.* Prior to the statute of 1886 authorizing the acquisition of the right

Clark v. Allaman.

to use the water of running streams for irrigation purposes by appropriation, and providing that, as between appropriators, the first in time is the first in right, there had been no recognition of such a legal doctrine in this state, either by statute or by decision of this court; local customs based upon such principles were invalid, and no water-rights of the character mentioned in the Revised Statutes of the United States, sections 2339 and 2340, had either vested or accrued.

8. ——— *Property in Flow of Running Water—Constitutional Guaranty.* By various statutes enacted since 1886 the legislature has recognized the diversion and appropriation of water for irrigation purposes to be a public use, and has allowed the right of eminent domain to be exercised in its aid; but property in the flow of running water acquired under the previously existing common-law system is protected by the fourteenth amendment to the constitution of the United States.

9. ——— *Dual Doctrines.* The doctrine of prior appropriation may exist in the same state with the common-law doctrine of riparian rights.

10. ——— *Right to Use Water for Irrigation.* The use of the water of a running stream for irrigation, after its primary uses for quenching thirst and other domestic requirements have been subserved, is one of the common-law rights of a riparian proprietor.

11. ——— *Use Must be Reasonable.* The use of water by a riparian proprietor for irrigation purposes must be reasonable under all the circumstances, and the right must be exercised with due regard to the equal right of every other riparian owner along the course of the stream.

12. ——— *Diminution of Flow—Damages.* A diminution of the flow of water over riparian land caused by its use for irrigation purposes by upper riparian proprietors occasions no injury for which damages may be allowed unless it results in subtracting from the value of the land by interfering with the reasonable uses of the water which the land-owner is able to enjoy.

13. ——— *Equality of Right.* In determining the quantity of land tributary to and lying along a stream which a single proprietor may irrigate the principle of equality of right with others should control, irrespective of the accidental matter of governmental subdivisions of the land.

14. ——— *Diversion of Water—Prescription.* A lower riparian owner acquires no prescriptive right against upper pro-

prietors to receive a given quantity of the flow of a stream by diverting and using it after it has left their land; and an upper proprietor can acquire no prescriptive right to divert water, as against owners down the stream, so long as the flow is sufficient for the needs of all.

Error from Wallace district court; LEE MONROE, judge. Opinion filed April 8, 1905. Reversed.

*Milton Brown,* for plaintiffs in error.

*C. C. Coleman,* attorney-general, as *amicus curiæ,* and *Roark & Roark,* for defendants in error; *S. S. Ashbaugh, N. H. Loomis,* and *F. Dumont Smith,* of counsel.

The opinion of the court was delivered by

BURCH, J.: The parties to this litigation are contesting for the right to enjoy one of nature's benignities. As if relenting from her severity toward the semiarid plains of Wallace county, where atmosphere and soil are parched in almost continuous drought, she has caused a number of springs of pure and wholesome water to break from the bosom of the earth and form the unfailing stream of Rose creek. Here wild things came in early days to slake their thirst; here the hunter of the bison and the wild horse lay in wait; and here the irrigation farmer came to practice agriculture.

The stream proper is formed by the confluence of a west and a south branch, and is only five miles long. Except as augmented by rain or snow or reduced by excessive evaporation the flow is constant throughout the year; and if not diverted for irrigation purposes would approximate five cubic feet per second at its mouth. In very dry times this amount might be reduced to two cubic feet per second. It empties upon the sands of the bed of the Smoky Hill river, usually dry except in flood seasons of the year.

Some time prior to the year 1871 a man known by the name of Comstock placed a dam in the west

branch of Rose creek, and from it constructed a ditch, by means of which he irrigated a garden-plot some four acres in extent.  The dam was built and the ditch was taken out upon land afterward patented to the Union Pacific Railway Company, and purchased from it by plaintiff in error H. A. Clark.  The water was used upon other land, to which, so far as the record shows, Comstock had taken no steps to acquire title, and which was entered by Clark, under the land laws of the United States, on September 12, 1876.  In 1871 Comstock sold his dam and ditch to H. W. Wheeler, who likewise appears to have made no effort to acquire title to the land.  In 1872 Wheeler failed to utilize the dam and ditch, but did so from 1873 to 1876, when he sold to Clark.  The land to which the water was diverted includes the course of the south branch of Rose creek.  Another tract of land through which the south branch flows was entered by Asa W. Clark on November 6, 1876, and afterward became the property of H. A. Clark.  In subsequent years Mr. Clark acquired much other land in the vicinity of that already referred to, placed other dams in the branches of the creek, constructed other ditches, and by means of his entire irrigation system brought under successful cultivation some seventy acres of land.

In the year 1875 a man known as A. L. Dodge placed a dam in the Smoky Hill river at a point below its junction with Rose creek.  At the place where the dam was located the water from Rose creek constituted the ordinary flow of the stream.  From the dam a ditch was constructed to a point more than a mile to the eastward, by means of which Dodge irrigated during the season of 1875 or 1876 some ten acres of ground lying partly on the south half of the southeast quarter of section 26, township 13 south, range 39 west.  Dodge appears to have been without legal interest in any of the land along the course of his ditch.  Section 27, on which the dam was built, was patented

to the Union Pacific Land Company on October 24, 1900, presumably as a successor in interest to the railroad company already mentioned. The southwest quarter of section 26, through which the ditch ran, was entered as a homestead by George H. Palmer on November 2, 1878, and subsequently patented to him.

In the autumn of 1876 George R. Allaman purchased the Dodge dam and ditch, and made some kind of a settlement on the southeast quarter of section 26, the character of which is not described. On April 12, 1877, he filed a declaratory statement for the north half of the southeast quarter of section 26, which, however, did not ripen into title. On January 8, 1880, he made a homestead entry of the entire southeast quarter of section 26, under which he subsequently obtained full title. On November 24, 1888, he conveyed the real estate thus acquired to his wife, Lizzie R. Allaman, the plaintiff in the district court and one of the defendants in error here. The Dodge ditch appears to run through the south half of the southeast quarter of section 26. None of Mrs. Allaman's land is riparian to Rose creek, but the channel of the Smoky Hill river traverses a part of her quarter-section.

The amount of irrigated land on the Allaman farm has been increased from year to year until it is now probably eighty acres in extent, and furnishes a striking example of the magical transformation produced by the application of water to desert soil. Land otherwise fit for pasture only, and worth not more than $2.50 per acre for that purpose, has been turned into orchard, garden, and meadow, regularly supports a growth of annual crops, and is worth $100 per acre.

Shortly prior to the commencement of the Dodge ditch defendant John W. Robb placed a dam across Rose creek, something more than a mile above its mouth, and from it constructed a ditch to land riparian to Rose creek, which he entered as a homestead on January 5, 1880. This entry in due time ripened

into title, and Robb continued to occupy the premises
with his wife and family until the present time. The
Robb ditch was so far completed that water from it
was used for irrigation purposes very soon after Alla-
man commenced to irrigate from the Dodge ditch.
After 1877 Robb steadily increased the amount of his
land under irrigation, until it has now an area of
about fifty acres.

On February 15, 1878, one Andrew J. Phillips made
a homestead entry of land riparian to Rose creek,
which was afterward patented to him, and which now
belongs to defendant Lewis Williams.

Titles to other lands along the course of Rose creek
were acquired by various persons on subsequent dates,
and following the earliest efforts at irrigation already
described other dams and ditches were established,
known as the Grant and Weisgerber, the Kyner and
the Williams plants. All together, the waters of Rose
creek now irrigate 300 acres of land in a semiarid re-
gion otherwise incapable of sustaining successful agri-
culture.

As the area under cultivation was extended year by
year an amount of water correspondingly larger was
necessarily diverted from Rose creek, and consumed.
None of the parties interested undertook to comply
with any of the irrigation statutes of the state. The
years of 1900 and 1901 were excessively dry. Then
the test came, and difficulties between the various ap-
propriators of water arose.

In a suit for an injunction, brought by Lizzie Alla-
man to restrain the use of water from Rose creek by
irrigators living up the stream, the district court, in a
decision supported by an able and exhaustive opinion,
apportioned the water among the various claimants
according to the law of prior appropriation in vogue in
certain of the Rocky Mountain states, rejecting alto-
gether the rules of the common law relating to ripa-
rian rights. As a result the plaintiff was given dam-

ages, and the superior right to substantially the entire quantity of the flow of Rose creek in unpropitious seasons.

The legal propriety of such a judgment is a question of first impression in this court, and now must be determined. The subject, however, is not a new one with the courts. It has been discussed with great ability by many distinguished judges and text-writers, definite doctrines have been established in all sections of the country, and a wealth of learning already has been accumulated and lies ready to hand for application.

The legal doctrine giving a preference to the diversion and appropriation of water to some beneficial use over common-law riparian rights is well understood. It is said to arise *ex necessitate rei*. In arid regions the little rainfall quickly comes and quickly goes. The dry air dissipates it, the ashen earth and the sands swallow it, and it sinks away to the rock strata underlying gravel beds; but the reservoirs of the mountains are annually filled with snow, which when melted runs down in fructifying streams sufficient to supplant the cactus and the sage-brush of valley and plain with foliage and flowers and opulent farmsteads. Without diversion this water could not be made potent for agriculture, mining or manufacturing purposes, and it is therefore entirely dissociated in legal thought from the channel in which it flows, and declared to be the public property of the state, subject to appropriation by any one that will capture it and devote it to beneficial uses; and, among the appropriators, those that are prior in time are prior in right. It has been conceived that this doctrine meets the necessities of the people dwelling in arid, mountainous states better than that of the common law relating to the use of the water of running streams, and it has been established there by constitution, by legislative act, and by decisions of the courts.

Viewed historically, the foundation for this doctrine

is not nearly so broad.   Such history is clearly and forcefully stated in the case of *Meng v. Coffee,* 67 Neb. 500, 509, 93 N. W. 713, 716, 60 L. R. A. 910:

"It arose in California at a time when government and law were not yet established, when there was no agricultural population and were no riparian owners, and when streams could be put to no use except for mining.   From the necessities of the case, there being no law applicable, the miners held meetings in each district or locality and adopted regulations by which they agreed to be governed.   As at that time streams could be put to no use except for mining, and as the use of large quantities of water was essential to mining operations, it became settled as one of the mining customs or regulations that the right to a definite quantity of water, and to divert it from streams or lakes, could be acquired by prior appropriation.   This custom acquired strength; rights were gained under it, and investments made, and it was soon approved by the courts and by local legislation; and, though not originally available against the general government or its patentees, was made so available by the act of congress in 1866.   (Act July 26, 1866, 14 Stat. at L., p. 253, ch. 262, §9; 2 U. S. Comp. Stat. 1901, p. 1437, §2339.)   But it was only the same rule as that by which possession of mining claims was recognized.   It was a custom intended to prevent disorder and forcible dispossession of those who had located mines.   As stated by Field, J., in *Atchison v. Peterson,* 20 Wall. 507, 22 L. Ed. 414: 'By the custom which has obtained among miners in the Pacific states and territories, where mining for the precious metals is had on the public lands of the United States, the first appropriator of mines, whether in placers, veins or lodes, or of waters in the streams on such lands for mining purposes, is held to have a better right than others to work the mines or use the waters.'   In other words, the doctrine in question was not formulated as an enlightened attempt to adjust the conflicting relations of a large community of individuals.   It was a crude attempt to preserve order and the general peace, and to settle customary rights among a body of men subject to no law, under which so many and so valuable rights arose that when the law stepped in it was obliged to recognize them.   In this way the rule of appropriation became

established in the Pacific states, in opposition to the common law, with reference to streams or bodies of water which wholly ran through or were situated upon the public lands of the United States. (Black's Pom. Water-rights, §15.) These rules, however, were confined to the public lands, and are so confined at the present time in California, Oregon and Washington. In other states and territories the new doctrine was given general application; sometimes by judicial decision, as in Nevada, but chiefly by constitutional or legislative enactment. Thus, in those states of which the whole or a portion is arid, we now find some in which the common-law rules are in force—California, Oregon, Washington, Montana, North Dakota and, substantially, Texas—though in many of these, for reasons stated, the other rule obtains upon the public lands of the United States; others in which the doctrine of prior appropriation is in general force—Nevada, Arizona, Colorado, Idaho, Utah, Wyoming. Of these, however, Colorado, Idaho and Wyoming have constitutional provisions declaring such to be the paramount law, and in the other jurisdictions named it is generally established by statute. Not only does the history of the rule obviously remove our state from its operation, but a mere comparison of the jurisdictions where the contending principles are in force is very suggestive. In all states which, like our own, are but partially arid, the common law is in force. The states holding to the contrary rule are wholly within the arid regions."

Essentially the same origin of the law of prior appropriation is acknowledged in the case of *Armstrong v. Larimer Co. Ditch Co.*, 1 Colo. App. 49, 55, 27 Pac. 235:

"Before any general organization, territorial or otherwise, was or could have been had, a tide of emigration poured into the region comprised in the present state, and over the entire West. It was found an arid, semidesert country. The land could only be made productive by the artificial use of water. The country was without law, but each individual brought with him the principles of equity and justice which were a part of. his education. It was soon found that the water of the streams was inadequate to supply all the land. · They

found a new climate, new conditions calling for new laws applicable to the conditions. The first comer settled near the stream. In the absence of surveys he designated by landmarks the boundaries and extent of his occupation of land. He diverted—appropriated by such diversion—a certain amount of water from the stream, supposed to be sufficient. Others settled near him upon the same stream, and made a like appropriation. In time there were agricultural settlers enough to organize and establish a local government, and a series of rules or laws were adopted, perhaps in many instances crude and inartificially drawn, but embodying principles of equity and justice. They were recognized and obeyed, the settlers recognizing, as before stated, a fact which later corporations and settlers have not yet apparently recognized, or, if recognized, have disregarded, that the supply of water in the streams was not sufficient for all the land."

Among the most elementary of our legal concepts is that of the adoption of the English common law as the basis of American jurisprudence. In "The Life and Letters of Joseph Story" (vol. 1, p. 299) it is related as perfectly well authenticated that John Adams—

"when he was vice-president of the United States, and Blount's conspiracy was before the senate, and the question whether the common law was to be adopted was discussed before that body, emphatically exclaimed, when all looked at him for his opinion as that of a great lawyer, that if he had ever imagined that the common law had not by the revolution become the law of the United States under the new government he never would have drawn his sword in the contest. So dear to him were the great privileges which that law recognized and enforced."

In 1793, in the case of *Chisholm, Ex'r, v. Georgia,* 2 Dall. 419, 435, 1 L. Ed. 440, Justice Iredell, of the supreme court of the United States, said:

"The only principles of law, then, that can be regarded, are those common to all the states. I know of none such, which can affect this case, but those that are derived from what is properly termed 'the common law,' a law which I presume is the ground-

work of the laws in every state in the Union, and which I consider, so far as it is applicable to the peculiar circumstances of the country, and where no special act of legislation controls it, to be in force in each state, as it existed in England (unaltered by any statute) at the time of the first settlement of the country."

In volume 1 of Kent's Commentaries, the preface to which is dated November 23, 1826, the great chancellor said:

"The common law may be cultivated as part of the jurisprudence of the United States. In its improved condition in England, and especially in its improved and varied condition in this country, under the benign influence of an expanded commerce, of enlightened justice, of republican principles, and of sound philosophy, the common law has become a code of matured ethics and enlarged civil wisdom, admirably adapted to promote and secure the freedom and happiness of social life. It has proved to be a system replete with vigorous and healthy principles, eminently conducive to the growth of civil liberty; and it is in no instance disgraced by such a slavish political maxim as that with which the Institutes of Justinian are introduced: *Quod principi placuit, legis habet vigorem.* It is the common jurisprudence of the United States, and was brought with them as colonists from England, and established here, so far as it was adapted to our institutions and circumstances. It was claimed by the congress of the united colonies, in 1774, as a branch of those 'indubitable rights and liberties to which the respective colonies are entitled.' (Declar. of Rights, Oct. 14, 1774; Jour. Cong., vol. 1, p. 28.) It fills up every interstice, and occupies every wide space which the statute law cannot occupy. Its principles may be compared to the influence of the liberal arts and sciences; *adversis perfugium ac solatium præbent; delectant domi, non impediunt foris; pernoctant nobiscum, peregrinantur, rusticantur.* To use the words of the learned jurist, to whom I have already alluded (Du Ponceau, Jurisdic., p. 91), 'we live in the midst of the common law, we inhale it at every breath, imbibe it at every pore; we meet with it when we wake and when we lay down to sleep, when we travel and when we stay at home; and it is interwoven with the

Clark v. Allaman.

very idiom that we speak; and we cannot learn another system of laws without learning, at the same time, another language.' " (Page 342.)

Doctrines utterly subversive of cherished principles of a system of law worthy of such profound respect ought not to be lightly entertained, and it becomes necessary to examine the legal history of this state to ascertain if it is vulnerable to the challenge of the judgment of the district court. The territory from which the state of Kansas was formed was derived from sources which were strange to the common law. All that portion of it lying north of the southern bank of the Arkansas river and east of the one-hundredth meridian was a part of the Louisiana purchase, made from France in 1803. The remainder belonged originally to Mexico, and was obtained through the annexation of Texas in 1850.

By an act of congress of March 26, 1804, the region newly acquired from France was divided by a line running west from the Mississippi river, at the present southern boundary of Arkansas. The southern part was organized as the territory of Orleans, with a government not quite of the same type as that formulated by the ordinance of 1787, but still a fair territorial government. In the northern portion, which was called, not the territory but the district of Louisiana, no regularly organized territorial government was established, but the executive power of the governor of the territory of Indiana was extended over it, and the governor and judges of the territory of Indiana were authorized to establish inferior courts, to prescribe the jurisdiction of such courts, and to make all laws which they might deem to be conducive to the welfare of the inhabitants of the district. (2 U. S. Stat. at L., p. 283.)

The inhabitants of the district of Louisiana remonstrated against this sort of government and petitioned for officers and a government of their own, according

to the principles of the ordinance of 1787. (Ann. Cong., 8th Cong., 2d sess., pp. 1608-1619.) Congress acceded to this request, and by the act of March 3, 1805, gave to the district a government of its own, and changed the name to Louisiana territory. Legislative authority was vested in a governor and three judges. (2 U. S. Stat. at L., p. 331.)

By an act of congress of June 4, 1812, the name of the territory of Louisiana was changed to Missouri territory, without any alteration of boundaries, and the French portion of the state of Kansas came under the jurisdiction of its general assembly, composed of a governor, a legislative council, and a house of representatives. (2 U. S. Stat. at L., p. 743.)

Up to that time the various legislative authorities of the region under consideration, including the congress of the United States, had promulgated general laws and particular acts recognizing, founded upon and putting in force the common law to such an extent as to amount to its practical establishment as the common law of the territory.

On January 19, 1816, the legislature of the territory of Missouri enacted the following statute:

"A law declaring what laws shall be in force in this territory.
"*Be it enacted, etc.:*

"1st. The common law of England which is of a general nature, and all statutes made by the British parliament in aid of or to supply the defects of the said common law, made prior to the fourth year of James the First, and of a general nature and not local to that kingdom, which said common law and statutes are not contrary to the laws of this territory, and not repugnant to nor inconsistent with the constitution and laws of the United States, shall be the rule of decision in this territory until altered or repealed by the legislature, any law, usage or custom to the contrary notwithstanding."

The state of Missouri was carved out of the territory of Missouri, and admitted into the Union in 1821,

Clark v. Allaman.

and that part of the territory of Missouri subsequently included within the limits of the state of Kansas was left unorganized and outside of any local jurisdiction. (7 Win. Nar. & Crit. Hist., p. 550, note 3.)

By an act of June 30, 1834, congress ordained that all that part of the United States west of the Mississippi, and not within the states of Missouri and Louisiana and the territory of Arkansas (organized in 1819), should be taken for the purposes of the act to be Indian country, and certain regulations were prescribed for its government. It was not intended that the Indian country should be open to settlement by white men. Their relations with the Indians were regulated, the laws of the United States relating to the punishment of crime were declared to be in force except as to crimes committed by one Indian against the person or property of another Indian, and for the purpose of carrying the act into effect the northern portion of the Indian country was annexed to the state of Missouri for judicial purposes, while the southern part was attached to the territory of Arkansas. (4 U. S. Stat. at L., p. 729.) Aside from these limited subjects, the purpose was that the only local laws and governments that were to obtain were to be the laws and governments of the Indians themselves, and Indian treaties were framed upon this express basis.

"The laws of the territory of Missouri had no force or effect in the Indian country after that country ceased to be a part of such territory." (*St. Louis &c. Railway Co. v. O'Loughlin,* 4 U. S. App. 283, 287, 49 Fed. 440, 1 C. C. A. 311.)

This status of affairs in the Louisiana portion of the state continued until the organization of the territory of Kansas.

After the independence of Texas from Mexico had been declared the following provision was inserted

in the constitution for the new republic, adopted on March 17, 1836:

"The congress shall, as early as practicable, introduce, by statute, the common law of England, with such modifications as our circumstances, in their judgment, may require; and in all criminal cases the common law shall be the rule of decision." (2 Char. & Con., p. 1757.)

Pursuant to this injunction the congress of Texas, on January 20, 1840, passed an act in the following terms:

"*Be it enacted, etc.:* That the common law of England, so far as it is not inconsistent with the constitution or the acts of congress now in force, shall, together with such acts, be the rule of decision in this republic, and shall continue in full force until altered or repealed by congress." (1 Say. Ear. L. Tex., art. 707.)

In the case of *Sparks v. Spence,* 40 Tex. 693, 701, this law is said to have taken effect from and after March 16, 1840. It remained in force at the time Texas became a part of the United States, and had not been abrogated at the time the Kansas-Nebraska bill was signed by President Pierce, on May 30, 1854.

On the date last mentioned Kansas became a territory, with boundaries including all of the present state and a considerable portion of the present state of Colorado.

Immediately upon the organization of the territory of Kansas the composition of its law received attention. In his message of July 3, 1855, to the first territorial legislature Governor Reeder said:

"It appears that the laws of the United States not inapplicable to our locality—the laws of the territory of Indiana made between the 26th of March, 1804, and the 3d of March, 1805, enacted for the district of Louisiana—the laws of the territory of Louisiana— the laws of the territory of Missouri—the common law, and the law of the province of Louisiana at the time of the cession, except so far as the latter have

Clark v. Allaman.

superseded the former, still remain in force in the territory of Kansas. As the common law to a considerable extent was adopted for the territory by congress as late as 1812, and by the Missouri legislature as late as 1816, . . . it has without doubt superseded and supplied a great amount of the law previously existing." (Page 5.)

At that session the following statute, which took effect November 1, 1855, was passed:

"AN ACT adopting the common law as the rule of action in this territory.

"*Be it enacted by the Governor and Legislative Assembly of the Territory of Kansas, as follows:*

"SECTION 1. The common law of England and all statutes and acts of parliament made prior to the fourth year of James the First, and which are of a general nature, not local to that kingdom, and not repugnant to or inconsistent with the constitution of the United States, and the act entitled 'An act to organize the territory of Nebraska and Kansas,' or any statute law which may from time to time be made or passed by this or any subsequent legislative assembly of the teritory of Kansas, shall be the rule of action and decision in this territory, any law, custom or usage to the contrary notwithstanding.

"SEC. 2. Punishment by virtue of the common law shall in nowise be other than fine and imprisonment, and such fine shall not exceed one hundred dollars, and such imprisonment shall not exceed six months; nor shall any of the British statutes for the punishment of crimes and misdemeanors be in force in this territory." (Stat. Kan. Ter., 1855, ch. 96.)

At the legislative session of 1859 this statute was reenacted in identical terms, and continued in force until superseded by state legislation.

The state of Kansas, with its present boundaries, was admitted into the Union on January 29, 1861. The first state legislature elected after admission met in 1862, and the territorial law of 1855 and 1859 adopting the common law as "the rule of action and decision, any law, custom or usage to the contrary notwithstanding" was reenacted *verbatim*. This statute

(Comp. Laws 1862, ch. 135) remained in force until October 31, 1868. The present law then became operative, and reads as follows:

"The common law as modified by constitutional and statutory law, judicial decisions, and the conditions and wants of the people, shall remain in force in aid of the general statutes of this state; but the rule of the common law, that statutes in derogation thereof shall be strictly construed, shall not be applicable to any general statute of this state, but all such statutes shall be liberally construed to promote their object." (Gen. Stat. 1868, ch. 119, §3; Gen. Stat. 1901, §8014.)

From this sketch it will be observed that the authority of the common law was prevalent throughout the confines of the state under every civilized form of governmental organization from the earliest times until the autumn of 1868, and all other systems were finally supplanted and obliterated, and could not be appealed to as measures of right. Such constant adherence to its principles could not have been occasioned by accident, or by indifference, but must have been the natural result of a deep-seated conviction of its complete efficiency as a means of justice.

A closer examination of the circumstances of its adoption justifies this conclusion. The few sparse settlements existing before the establishing of the Indian country may be passed over and attention be directed to the more active efforts at state making, beginning near the time of the passage of the Kansas-Nebraska bill. For some months previous to the enactment of that law the government at Washington had been busy negotiating treaties with various Indian tribes, whereby the soil of Kansas lying west of Missouri was opened to settlement. The great excitement in different sections of the country over the question of slavery in the new territory, the foundation of emigrant aid societies, the sudden influx of a heterogeneous population, and the resulting political conflicts, are matters of common knowledge. Throughout it

all there is no trace of any disagreement of the people concerning the adequacy of the common law to meet all the requirements of their societary relations in their new environment.  On the part of the South, the states of Missouri, Alabama, South Carolina and Georgia took the lead in colonization.  (The Buford Expedition to Kansas, 6 Am. Hist. Rev., p. 38.)

Upon its organization as a state the legislature of Missouri placed upon its statute-book an adoption of the common law in terms similar to those of the territorial enactment.  The effect of this statute upon the question of water-rights is indicated by the following quotations from the later decisions of its supreme court:

"Unless authorized by lawful authority no one can interfere to any material extent with the waters of a running stream. . . . The statute of this state (§3117, p. 521) declares that 'the common law of England . . . shall be the rule of action and decision in this state, any law, custom or usage to the contrary notwithstanding.'  This statutory obligation and duty has been recognized and enforced, as we have seen, in all the earlier and later adjudications of this court on this subject." (*Abbott v. The K. C. St. J. & C. B. Ry. Co.*, 83 Mo. 271, 285, 53 Am. Rep. 581.)

"The plaintiff was the possessor of certain riparian rights.  These rights were property.  Of that property he could not be deprived without just compensation, nor could the state itself either exercise such a power of deprivation or confer it upon some subordinate municipality dissevered from the constitutional condition of compensation for the property taken. . . . On this point I entirely concur with Judge Bakewell of the court of appeals, where he says: 'When it is settled that riparian rights are property, and of this there seems to be no doubt, the question as to the right to take them without compensation is at an end.'  *Myers v. City of St. Louis,* 8 Mo. App. 266." (*Myers v. The City of St. Louis,* 82 Mo. 367, 378, 375.)

Immigrants from the other Southern states named were inured to the principles of the common law.  (8

Cyc. 387.) It was likewise notoriously the heritage of the men who came from the North to Kansas to aid in establishing its law. There is something of an analogy between the peopling of the territory of Kansas and the peopling of the territory of Oklahoma, so far as the question under consideration is concerned, and the result in the latter instance is described in a recent decision of the supreme court of Oklahoma as follows:

"When people from all parts of the United States on the 22d day of April, 1889, settled the country known as Oklahoma, built cities, towns and villages, and began to carry on trade and commerce in all its various branches, they brought into Oklahoma with them the established principles and rules of the common law as recognized and promulgated by the American courts, and as it existed when imported into this country by our early settlers and modified by American or English statutes." (*McKennon v. Winn,* 1 Okla. 327, 334, 33 Pac. 582, 22 L. R. A. 501.)

Included in this system were rules respecting rights to use the water of running streams.

The opening sentence of the second chapter of the "Conquest of Kansas," written by the late William A. Phillips in 1856, is as follows:

"The cabins of squatters had begun to dot the face of the country, and the music of the pioneer's axe was ringing amongst the timber that shaded the watercourses of Kansas."

The tide of immigration followed the lines of the watercourses. Along their banks the first land titles were acquired, the first homes founded, the first cities built, the first industries established. Therefore, the common law relating to riparian rights was not a mere matter of academic interest or learned study, as a survival from medieval times, to those who established the foundations of the state's greatness, but it was the law of reason and of justice, responding to

the actual demands of the times and to the circumstances and needs of the people.

It is true that in Kansas, as in California and Colorado, codes of "squatter laws" were adopted, but in origin and purpose they bore no resemblance to those of the West already described.

At first consideration uncertainty existed with reference to the proper interpretation to be given the laws of the United States relating to the acquisition of land in the new territory. (6 Op. Atty.-gen., p. 658, Aug. 12, 1854.) Because of this uncertainty, and because of the practice then becoming common of making fictitious settlements for political purposes only, various codes of the character named were adopted. A number of these were merged into the rules and regulations for settlers agreed upon at a meeting of the "Actual Settlers' Association of Kansas Territory" (afterward called "The Mutual Settlers' Association of Kansas Territory") on August 12, 1854, at Millersburg. The preamble and article 14 of these rules are as follow:

"Whereas, the laws of the United States confer upon. citizens the privilege of settling and holding lands by preemption right; and, whereas, the Kansas valley, in part, is now open for the location of such claims; and, whereas, we, the people of this convention, have and are about to select homes in this valley, and in order to protect the public good, and to secure equal justice to all, we solemnly agree and bind ourselves to be governed by the following ordinances: . . .

"14. The limits of this association shall be the waters of the Wakarusa and Kansas rivers, and the territory between the same, from the mouth of the Wakarusa up to the Shawnee purchase." (Walt. Hist. of Kan., p. 19.)

From this it is apparent that the Kansas codes of necessity merely undertook to protect the lawful efforts of men and women who in good faith were ac-

15—71 KAN.

tually endeavoring to secure homes in the vicinity of the streams, and in no wise sought to supplant the law of the land; and the customs of the people adopting them were not antagonistic to the rules of the common law, as were those of the settlers of the mountain states. Home builders in Kansas did not need to divert the courses of the streams upon whose banks they settled, and they did not do so. Irrigation was not necessary for agriculture, manufacturing, mining, or any other industrial purpose. Soil, climate and the natural topography of the country forbade its successful use; and it was not until the state had become filled with a population accustomed to rely upon the common law as the measure of their rights that the subject began to attract attention. At that time the lines of the state's development had become fixed, its legal system had become settled, and under the various territorial and state statutes already quoted, making the common law the rule of conduct and decision, any custom or usage to the contrary notwithstanding, usages and customs of the character of those exhibited by the early occupants of land in the arid states were actually prohibited, at least until within two years of the construction of the Comstock dam and ditch.

Under these circumstances there is no room for debating either the existence or the justice of the common-law rules relating to the rights of riparian landowners in this state. The legislature has recognized them, as, for example, in the mill-dam act of 1867 (Laws 1867, ch. 87), providing for the assessment and payment of damages to the owners of land both "above and below" the projected dam, occasioned by "overflowing or otherwise," which includes diversion; and this court has always recognized them.

"Every man through whose land a stream of water runs is entitled to the flow of that stream without diminution or alteration.

Clark v. Allaman.

"The Council Grove Peerless Mill Company in 1874, with the assent of an upper riparian owner, dug a channel through the lands of such owner from a point on the Neosho river to its mill, and thereby diverted from its natural channel through the land now belonging to plaintiff in error a portion of said stream, and this without the assent of the then owner of said plaintiff in error's land. *Held*, that thereby the mill company acquired no right to continue said diversion, or to restrain plaintiff in error from removing any obstruction, natural or artificial, in the bed of said river on his lands. . . .

"The right to the use of the flow of water in its natural course is connected with and inherent in the property in the land, and passes by a conveyance of the land." (*Shamleffer v. Peerless Mill Company*, 18 Kan. 24.)

"Now, that the flow of water in the natural channel of a surface stream is a property right of the riparian owner, is unquestioned and familiar law. *Shamleffer v. Mill Co.*, 18 Kan. 24. If an individual should, by digging a new channel a few hundred feet above Soden's dam, attempt to divert the flow of the stream, beyond doubt he would be restrained. And this restraint would be granted, not because of the mere fact of digging a channel, but because thereby the natural flow of the stream was prevented; not because of the manner, but because of the fact of the diversion. The restraint would be granted as readily if the abstraction was by pipes and pumps, as if by channel and a change of current. The principle is this: That whatever of benefit, whether of power or otherwise, comes from the flow of water in the channel of a natural stream, is a matter of property and belongs to the riparian owner, and is protected in law just as fully as the land which he owns. It cannot be taken for private use except by his consent, and for public use only upon due compensation." (*City of Emporia v. Soden*, 25 Kan. 588, 604, 37 Am. Rep. 625.)

"It must be conceded that the defendant in error has the undoubted legal right to the use and enjoyment of the flow of the water in a natural watercourse that runs through his land. This right is an

immemorial one, and is protected by all courts." (*A. T. & S. F. Rld. Co. v. Long,* 46 Kan. 701, 702, 27 Pac. 182, 183, 26 Am. St. Rep. 165.)

"An owner of land has a right to change the channel and divert the water in a stream flowing through his land, providing that he returns the water to the original channel before it reaches the land of the proprietor below." (*Mo. Pac. Rly. Co. v. Keys,* 55 Kan. 205, 40 Pac. 275, 49 Am. St. Rep. 249.)

"The plaintiffs in error had a right to confine the waters of the creek to the channel, and, to accomplish that, were entitled to build cribs or barriers along the south bank of the creek in order to protect their property from the overflow and waste. This must be done, however, in such a way as not to interfere with the rights of others. They cannot build and maintain structures which will change the channel of the stream, or project the water against and upon the property of another in such a way as will result in substantial injury to either an owner upon the opposite side of the stream, or those above or below." (*Parker v. City of Atchison,* 58 Kan. 29, 36, 48 Pac. 631, 634.)

It is an essential characteristic of the common law that it exists for all the people, and has regard for their solidarity of interest as an integral whole. As one of the ablest publicists of the last century has said:

"A common law, to be a real advantage to the people, *must be a general law,* and the judicial organism must contain that organic arrangement by which confusion and consequent insecurity are prevented. Without it the common law, as any other system of law, ceases proportionately to be a protection of the citizen." (Lieb. Civ. Lib. & Self-Gov., p. 211.)

The language of the courts is to the same effect.

"Our ancestors brought with them the common law or general customs of England, but none of the particular customs. The common law became the law of *our whole state, and gave the rule to every part of it.*" (*Harris v. Carson,* 7 Leigh [Va.] 632, 638, 30 Am. Dec. 510.)

Clark v. Allaman.

"Our ancestors who settled this country were chiefly English, and brought with them, for their government in the social state, the common law of England; that is, the law not passed by any legislative authority, but which had its origin in consent. Most of our law is of this nature. Wherever a free people 'consent and use a certain rule or method as a law, such rule, etc., gives it the power of a law, and if it is *universal,* then it is the *common law;* if particular to this or that place, then it is *custom.*' 3 Salk. 112." (*Stimmel v. Brown,* 7 Hous. [Del.] 219, 224, 30 Atl. 996, 997.)

"The defendant, who claimed under a reentry and sale by the proprietors of the town of Lebanon, for a forfeiture incurred by the non-payment of rent, offered to give evidence of a custom in the said town, to proceed in the same course which the proprietors had taken in this instance. This evidence the court rejected, and I think very properly. Miserable will be our condition, if property is to depend, not on the contract of the parties, expounded by established principles of law, but on what is called the custom of particular places, so that we may have different law in every town and village of the commonwealth. There are indeed cases in which the common law of England has not been adopted in this country; and in such cases it was necessary to show what the custom had been here; but those were general customs *pervading the whole state."* (*Stoever v. Lessee of Whitman,* 6 Binn. [Pa.] 416, 419.)

What is true of the system must be true of each rule which it embraces, and the common-law rules relating to riparian rights became the law of Kansas for every stream within its borders.

It will not be denied that in every state particular rules of the common law, as it existed in England prior to the fourth year of the reign of James I, are not consciously regarded as binding; many others are consciously rejected, and new rules, the product of American conditions, departing widely from the English common law in fact, and quite indifferent to it in theory, became established and must be recognized

as of controlling authority. Rules of law have their birth, growth and decay, like generations of men, and in order to meet the expanding needs of the inhabitants of the young commonwealth the legislature enacted the statute of 1868 continuing in force the common law only as modified by constitutional and statutory law, judicial decisions, and the condition and wants of the people.

But this statute was not designed to disturb any part of the common law which, because of its adaptability to the genius and needs of its people, had become the established law of Kansas. It gave authority for the neglect of all rules of the ancient common law that were inapplicable to the exigencies of an independent, self-directing people, striving with their own peculiar conditions and circumstances, but none of those doctrines that already had been absorbed and incorporated into the legal system of Kansas was affected; and no part of the settled law of the state having the common law for its source became exposed to repeal, either by the repetition of infractions by individuals in particular localities or by judicial legislation based upon such infractions. If such were the case there would be little further use for a legislature in this state.

The character of the claim made for the plaintiff in this suit is inconsistent with all accepted ideas of the nature of law. It is not pretended that the conditions and wants of the people in those comparatively limited localities of the state where irrigation can be practiced with success have become paramount to the conditions and wants of the great body of the population who have no occasion to resort to that expedient, nor that the rules relating to the rights of landowners along the banks of watercourses can be totally effaced and expunged from the law of the state and the rules of the arid states upon that subject substituted; but the court is asked to relieve some of the people

from the burden of the common law, and declare certain antagonistic rules to be law for them only.

Laws are not like garments, which citizen and judge may put on and off at will. To have the force of law a rule must possess the quality of uniformity and universality, and must operate upon all members of the entire political community affected by it alike. (1 Bl. Com. p. 44.) The right of every individual to life, liberty or property must be regulated by the same rules that govern every other member of the body politic similarly situated. (*Vanzant v. Waddell,* 2 Yerg. 260, 270; *State Bank v. Cooper et al.,* 2 id. 599, 606, 24 Am. Dec. 517; *The Regents of the University of Maryland v. Williams,* 9 G. & J. 365, 412, 31 Am. Dec. 72.) A law for a section of the state is not a law of the land, and modifications of the common law to meet the conditions and wants of individuals in localities would not constitute modifications to meet the conditions and wants of "the people." Nothing less than the welfare of the whole people can be considered, and the sovereignty of society at large must be behind the adoption and enforcement of any rule or it is not law.

A single case, that of *Seeley v. Peters,* 10 Ill. 130, is cited as sustaining the view that a common law may prevail in one part of the state and be rejected in another, but no principle of that character is discoverable from the opinion of the court. It merely holds that the common-law rule relating to cattle running at large is not applicable to the condition and circumstances of the people of the state of Illinois, and, hence, does not prevail there. It is interesting to note that this court took a different view of the same question when it arose in this state and remarked:

"The plaintiffs, however, claim that the common law in this respect has been abolished by the custom of the country and by statute. As the common law has been adopted by statute and made the paramount

rule by express enactment of the legislature, 'any custom or usage to the contrary notwithstanding,' (Comp. Laws 1862, ch. 135) we suppose it would take more than a custom of the country to repeal it." (*U. P. R. W. Co. v. Rollins,* 5 Kan. 175, decided in 1869.)

The court might well have gone further and said that evidence of local customs opposed to established legal doctrines will not be received at all. (29 A. & E. Encycl. of L. 376.)

"And it is well settled that usage cannot be allowed to subvert the settled rules of law. Whatever tends to unsettle the law, and make it different in the different communities into which the state is divided, leads to mischievous consequences, embarrasses trade, and is against public policy." (*Barnard v. Kellogg,* 10 Wall. 383, 391, 19 L. Ed. 987.)

"To permit the temporary or indolent usages of each locality to control contracts, would be to make contracts conceived in the same language, and relating to the same subject-matter, mean one thing in one place and another in another. A contract for clearing land might thus be made to mean one thing in Posey county, and quite another in Steuben or Lake. In one locality, the word *clearing* might mean to take out the stumps; in another, to clear off everything but the stumps; and in another, to clear off such timber as was eighteen inches and under. And the same contract, in precisely the same words, would mean each of these things in the respective localities. This would create a body of local laws far more intricate and embarrassing in judicial investigations than the local statutes with which the state was formerly inundated. The recognition of these local usages is, as a general rule, contrary to the public policy of this state. Our constitution and judicial decisions are hostile to local legislation and local customs. The policy of the state is to have all her localities a unit—the same law and the same rule of decision prevailing everywhere throughout the state. Perhaps it is not too much to say that a good usage or custom in this state should, in addition to the common-law requisites, be shown to prevail all over the

state, regarded as a single locality." (*Harper v. Pound*, 10 Ind. 32, 35.)

"The gist of the objection is not that the custom is in contradiction to the express terms of the contract; but that it permits a general rule of law which is applicable to the contract to be superseded by a local rule adopted by particular classes of men, and thus leads to confusion, misunderstanding, and wrong." (*Dickinson v. Gay and another*, 7 Allen, 29, 33, 83 Am. Dec. 656.)

"If we admit evidence of this special custom, we allow the law to be changed by the testimony of witnesses, or by the soda dealers of Philadelphia." (*Wetherill v. Neilson*, 20 Pa. St. 448, 453, 54 Am. Dec. 741.)

"The introduction of such proof would destroy everything like certainty in contracts, and without attaining the justice of the case more effectually than is done by the rules of interpretation which our predecessors have established. No witness would be qualified to prove a custom pervading the whole state, for the knowledge of such transactions is generally confined to the neighborhood. Beside, there would be no uniformity of practice on the subject. In the eastern counties, where land has nearly attained to its ultimate value, and where the farms have been reduced by frequent subdivision, such a thing as giving in the allowance, or selling in any other way than by strict measure, is unknown. The consequence of suffering the interpretation of the contract to be affected by parol evidence, would be, that in place of the practice 'of the country,' we should have the practice of each county, and an interpretation peculiar to each. On the mischief to be apprehended from a state of such confusion, it is unnecessary to dilate." (*Paull v. Lewis*, 4 Watts [Pa.] 402, 404.)

"In *Rankin v. American Insurance Company* (1 Hall, 619) it was thought to be well settled that a usage could never be set up to contradict a rule of law. . . . The same rule applies where usage is offered to oppose or alter a general principle or rule of law, and upon a given state of facts, make the legal rights or liabilities of the parties other than they are

by the common law. . . . Whatever tends to unsettle the law and make it different in different portions of the state would lead to mischievous consequences, and be against public policy (*Thompson v. Ashton*, 14 Johns. 317), and so it has been frequently held." (*Corn Exchange Bank v. Nassau Bank*, 91 N. Y. 74, 81, 82, 43 Am. Rep. 655.)

"A rule of law can never be subverted by local custom, and, in so far as it holds otherwise, the case of *Dibbs v. The State*, 43 Tex. 650, is overruled. The trial court, in this case, properly rejected evidence to the effect that a general custom, in the county of the offense, gave to any one the right to kill all unmarked hogs, over twelve months old, found on the range." (*Lawrence v. The State*, 20 Tex. App. 536.)

"A right by custom to maintain a building or permanent structure upon the land of another could not be acquired." (*Attorney-general v. Tarr*, 148 Mass. 309, 318, 2 L. R. A. 87, 19 N. E. 358.)

"Equally immaterial, as we think, is the matter of custom among coal operators in the Hocking valley and the surrounding mining districts near thereto, of depositing slack and refuse on their own lands, when such custom is invoked to justify deposits so placed as to naturally allow them to wash down to the injury of lands lying below them. The rights of the plaintiff to the uninterrupted use of his land, and the unimpaired use of the water of Monday creek, being secured to him by the common law, how is it possible that a custom can deprive him of them? Why should a usage, the effect of which, if recognized, is to permit one man to take from another his property rights without compensation, be sanctioned? If it be assumed that the custom is a general one, then it is part of the common law itself, and there would be presented an instance of two rules of law, equally binding, and yet wholly inconsistent the one with the other. If it be claimed that the custom is a particular one, then we have the anomaly of a landowner's common-law right in his land taken from him by a usage of a particular trade, established by strangers, which it is not pretended he has ever been cognizant of, much less assented to. To have affected the plaintiff, the custom must have been shown to be reason-

able and certain, known to him, or to have been so general and well established that knowledge would be presumed, peaceably acquiesced in, and not unjust, oppressive, or in conflict with an established rule of public policy. The alleged custom possessed scarcely one of these attributes. Even though it had been common throughout the state, it would not avail. A usage which is not according to law, though universal, cannot be set up to control the law. *Meyer v. Dresser,* 111 E. C. L. R. 646; *Stoever v. Whitman,* 6 Binn. 416; *Inglebright v. Hammond,* 19 Ohio, 337, 53 Am. Dec. 430." (*The C. & H. C. & I. Co. v. Tucker,* 48 Ohio St. 41, 59, 26 N. E. 630, 12 L. R. A. 577, 580, 29 Am. St. Rep. 528. See, also, 13 L. R. A. 438, note; 11 Am. St. Rep. 632, note.)

If the position of the plaintiff were correct all the evils pointed out by these cases would follow. Geography would become the determining factor of law. If the analogy of the statute of 1891 should be followed, and the ninety-ninth meridian should be declared to be a dividing line, appropriators on the west might take all the water from the innumerable streams crossed by that line and leave the riparian rights of landowners on the east to attach to dry beds only. If an indefinitely bounded arid region should be recognized the existence of law must depend upon the verdict of a jury as to the character of the locality. Such a verdict at best could represent nothing more substantial than an opinion upon matters about which men differ. Climate would become material, and the line no doubt would shift backward and forward across the state, following successions of wet and dry seasons, and a person having the rights of a riparian owner one year might find the water of his stream subject to appropriation the next. Other anomalous facts incompatible with any rational system of laws, and subversive of accepted notions of societary rights, might be adverted to. Besides all this, if the sectional doctrine contended for were open to recognition it could have at best only a limited op-

eration, even in the western part of the state, where the plaintiffs' land lies.

The Union Pacific railroad was completed to Sheridan on August 22, 1868, before the statute of 1868 took effect. It is a matter of common knowledge that the shrewd acquisition of much desirable land along the watercourses preceded, accompanied and followed the building of that road, and to all such tracts the common-law rules respecting riparian rights attached. The fourteenth amendment to the constitution of the United States was promulgated July 28, 1868. After that, neither custom, judicial decision nor legislative enactment could destroy the vested rights of those who were then proprietors of land on the banks of streams. More than this, a change in the constitution itself could not abrogate them.

"Section 210 of the constitution provides that 'all flowing streams and natural watercourses shall forever remain property of the state for mining, irrigation and manufacturing purposes.' . . . At common law, the owner of land through which a non-navigable stream flowed was possessed of the title to the bed of the stream, as well as the right to a reasonable use of the water. The land under the water was his. The right to a reasonable use of the stream was as much his property as the land itself. The course of the stream could not be so diverted as to cause it to cease to flow in its accustomed channel upon his property. (Gould, Waters, § 4; Ang. Watercourses, §§ 1-4; *Green Bay & M. Canal Co. v. Kaukauna Water Power Co.*, 90 Wis. 370, 61 N. W. 1121; and 63 N. W. 1019, 28 L. R. A. 443, 48 Am. St. Rep. 937, and cases cited.) These doctrines of the common law were in force in the territory of Dakota at the time of the adoption of the constitution of this state. By virtue of them, the riparian owners in the territory were vested with the specified property rights in the bed of all natural watercourses, and in the water itself. Such rights were under the protection of the fourteenth amendment to the federal constitution, which protects property against all state action that does not constitute due process of law. It follows that

section 210 of the state constitution would itself be unconstitutional in so far as it attempted to destroy those vested rights of property, if it should by construction be given a scope sufficiently wide to embrace such matters." (*Bigelow v. Draper,* 6 N. Dak. 152, 162, 69 N. W. 570, 573.)

After a most thorough and exhaustive consideration of this subject the supreme court of Nebraska reached a conclusion toward which all the foregoing discussion tends. In the case of *Crawford Co. v. Hathaway,* 67 Neb. 325, 93 N. W. 781, 785, 60 L. R. A. 889, it was said:

"In solving the problems arising in the development of this most important industry, and extending to it all legitimate encouragement and recognition which may properly come from the judiciary, we cannot lose sight of the fundamental principles which should control our action, and govern in the disposition of all matters coming before the court for adjudication. Property rights, when vested, must be jealously guarded and upheld, or we do violence to the most rudimentary principles of justice. Admitting, for the sake of argument, that the law of public ownership of waters and the right of appropriation thereof for beneficial use by individual citizens and corporations is preferable to the private ownership of riparian proprietors in the western portion of the state, where irrigation is necessary, it is at once obvious that these conditions can be held to apply only to a portion of the state, and in fact to a lesser area than where irrigation is proven to be not essential to successful agriculture. As is pertinently said in the first opinion, 60 Neb. 754, 762, 84 N. W. 273: 'But can any one tell at what particular point in the state the common-law rule applicable to riparian owners would cease and the rule said to be better applicable to the less-favored portion of the state would begin? Such a rule would merely tend to breed "confusion worse confounded," and would be an assumption of legislative powers by this court inhibited by the constitution.'"

While the common-law doctrine respecting riparian rights is fundamental in the jurisprudence of this

state, it has been modified by various statutes enacted for the laudable purpose of encouraging irrigation. A list of all the statutes in any way referring to the subject of irrigation follows:

Subdivision 34 of article 2 of chapter 23 of the General Statutes of 1868, authorizing the formation of corporations for the construction and maintenance of canals for irrigation or manufacturing purposes.

Chapter 105 of the Laws of 1872, amending the section just referred to so as to provide for the formation of corporations for the construction and maintenance of dams and canals for water-works, irrigation or manufacturing purposes.

Chapter 133 of the Laws of 1885, creating liens for irrigators.

Chapter 134 of the Laws of 1885, prescribing punishment for injuries to irrigating canals.

Chapter 115 of the Laws of 1886, section 1 of which is as follows: "The right to the use of running water flowing in a river or stream in this state, for the purposes of irrigation, may be acquired by appropriation. As between appropriators, the one first in time is the first in right."

Chapter 165 of the Laws of 1889, enabling irrigating-ditch and canal companies to condemn rights of way.

Chapter 133 of the Laws of 1891, declaring that, in all that portion of the state of Kansas situated west of the ninety-ninth meridian, all natural waters, whether standing or running, and whether surface or subterranean, shall be devoted, first, to purposes of irrigation uses, and secondly, to other industrial purposes, and may be diverted from natural beds, basins or channels for such purposes.

Chapter 162 of the Laws of 1895, creating a board of irrigation and authorizing certain experiments.

Chapter 95 of the Laws of 1899, authorizing the appropriation of lands for irrigation purposes.

Clark v. Allaman.

Chapter 151 of the Laws of 1899, authorizing the condemnation of land by irrigation, canal or reservoir companies.

From these statutes it will be observed that the diversion and appropriation of water to beneficial uses has been recognized to be a public use, and the right of eminent domain may be invoked for the purposes sought to be accomplished; but, manifestly, proceedings under these statutes cannot operate to the destruction of previously vested common-law rights. Property in the flow of water acquired under the old system is protected by the constitution of the United States, and can be condemned for public uses only under the same restrictions as apply to the taking of other private property for public uses. (*City of Emporia v. Soden, supra.*) Any other interpretation of the statutes would render them void.

On July 26, 1866, the congress of the United States passed an act which reads as follows:

"Whenever, by priority of possession, rights to the use of water for mining, agricultural, manufacturing, or other purposes, have vested and accrued, and the same are recognized and acknowledged by the local customs, laws, and the decisions of courts, the possessors and owners of such vested rights shall be maintained and protected in the same; and the right of way for the construction of ditches and canals for the purposes herein specified is acknowledged and confirmed; but whenever any person, in the construction of any ditch or canal, injures or damages the possession of any settler on the public domain, the party committing such injury or damage shall be liable to the party injured for such injury or damage." (Rev. Stat. U. S. §2339.)

On July 9, 1870, this law was supplemented by another, as follows:

"All patents granted, or preemption or homesteads allowed, shall be subject to any vested and accrued water-rights, or rights to ditches and reservoirs used in connection with such water-rights, as may have

been acquired under or recognized by the preceding section." (Rev. Stat. U. S. § 2340.)

The customs referred to in the act of 1866 are the customs alluded to in the history of the doctrine of appropriation already given. In the case of *Atchison v. Peterson,* 20 Wall. 507, 512, 22 L. Ed. 414, after stating the common law, Justice Field said:

"This equality of right among all the proprietors on the same stream would have been incompatible with any extended diversion of the water by one proprietor, and its conveyance for mining purposes to points from which it could not be restored to the stream. But the government being the sole proprietor of all the public lands, whether bordering on streams or otherwise, there was no occasion for the application of the common-law doctrine of riparian proprietorship with respect to the waters of those streams. The government, by its silent acquiescence, assented to the general occupation of the public lands for mining, and, to encourage their free and unlimited use for that purpose, reserved such lands as were mineral from sale and the acquisition of title by settlement. And he who first connects his own labor with property thus situated and open to general exploration, does, in natural justice, acquire a better right to its use and enjoyment than others who have not given such labor. So the miners on the public lands throughout the Pacific states and territories by their customs, usages, and regulations everywhere recognized the inherent justice of this principle; and the principle itself was at an early period recognized by legislation and enforced by the courts in those states and territories."

As already shown, such practices are alien to the history of this state. Prior to the statute of 1886 there was no recognition in this state of rights to the use of water by priority of possession. Local customs to that effect were invalid; decisions of this court— notably that of *Shamleffer v. Peerless Mill Company, supra,* rendered early in 1877—were based upon contrary principles; and the legislature had been content to accept the court's interpretation of the law. There-

Clark v. Allaman.

fore, before that time there could be no "vested and accrued water-rights" to be protected by the acts of congress quoted. With the enactment of the statute of 1886 the policy of the state with reference to the appropriation of water for irrigation purposes changed and rights of the character referred to might accrue and vest. In section 661 of volume 3 of Farnham on Waters and Water-rights (a sound and capable guide upon this entire subject) it is said:

"As appears from the above principles, the law of the states in which riparian rights have not been abolished is that, so long as the land and water belong to the government, the first one who makes use of the water has the better right to it, of which he cannot be deprived by a subsequent grant of the riparian land to private owners; but that, when the land along the stream passes into private ownership, the right to make appropriations of water ceases and all future-acquired rights must be determined by the common law."

That the doctrine of appropriation may exist in the same state with the doctrine of riparian rights has been demonstrated in the case of *Crawford Co. v. Hathaway, supra.*

From the history of the titles to land riparian to Rose creek given above it is apparent that the plaintiff can claim nothing under the acts of congress of 1866 and 1870.

The authorities are unanimous to the effect that the use of water for irrigation is one of the common-law rights of a riparian proprietor. (3 Farn. Wat. & Wat.-rights, §599; 17 A. & E. Encycl. of L. 487.)

The restrictions upon the use of water for irrigation, after the primary uses for quenching thirst and for domestic requirements are subserved, are those which justice and equity suggest. In all cases the use must be reasonable, and the right of each must be exercised with due regard for the equal rights of others.

The general rules upon the subject were stated by Chief Justice Shaw in the case of *Elliott v. Fitchburg Railroad Company,* 10 Cush. 191, 193-196, 57 Am. Dec. 85, decided in 1852, as follow:

"The right to flowing water is now well settled to be a right incident to property in the land; it is a right *publici juris,* of such character, that whilst it is common and equal to all, through whose land it runs, and no one can obstruct or divert it, yet, as one of the beneficial gifts of Providence, each proprietor has a right to a just and reasonable use of it, as it passes through his land; and so long as it is not wholly obstructed or diverted, or no larger appropriation of the water running through it is made than a just and reasonable use, it cannot be said to be wrongful or injurious to a proprietor lower down. What is such a just and reasonable use, may often be a difficult question, depending on various circumstances. To take a quantity of water from a large running stream for agriculture or manufacturing purposes, would cause no sensible or practicable diminution of the benefit, to the prejudice of a lower proprietor; whereas, taking the same quantity from a small running brook passing through many farms, would be of great and manifest injury to those below, who need it for domestic supply, or watering cattle; and therefore it would be an unreasonable use of the water, and an action would lie in the latter case and not in the former. It is therefore, to a considerable extent, a question of degree; still, the rule is the same, that each proprietor has a right to a reasonable use of it, for his own benefit, for domestic use, and for manufacturing and agricultural purposes. . . .

"That a portion of the water of a stream may be used for the purpose of irrigating land, we think is well established as one of the rights of the proprietors of the soil along or through which it passes. Yet a proprietor cannot under color of that right, or for the actual purpose of irrigating his own land, wholly abstract or divert the watercourse, or take such an unreasonable quantity of water, or make such unreasonable use of it, as to deprive other proprietors of the substantial benefits which they might derive from it, if not diverted or used unreasonably. . . .

Clark v. Allaman.

"This rule, that no riparian proprietor can wholly abstract or divert a watercourse, by which it would cease to be a running stream, or use it unreasonably in its passage, and thereby deprive a lower proprietor of a quality of his property, deemed in law incidental and beneficial, necessarily flows from the principle that the right to the reasonable and beneficial use of a running stream is common to all the riparian proprietors, and so, each is bound so to use his common right, as not essentially to prevent or interfere with an equally beneficial enjoyment of the common right, by all the proprietors. . . .

"The right to the use of flowing water is *publici juris,* and common to all the riparian proprietors; it is not an absolute and exclusive right to all the water flowing past their land, so that any obstruction would give a cause of action; but it is a right to the flow and enjoyment of the water, subject to a similar right in all the proprietors, to the reasonable enjoyment of the same gift of Providence. It is therefore only for an abstraction and deprivation of this common benefit, or for an unreasonable and unauthorized use of it, that an action will lie."

The fairness and equality of right between owner and owner here proposed must commend themselves to all considerate persons.

Some of the matters to be taken into consideration in applying the rules suggested are enumerated in the case of *Harris v. Harrison,* 93 Cal. 676, 681, 29 Pac. 325, 326, as follow:

"The larger the number of riparian proprietors whose rights are involved, the greater will be the difficulty of adjustment. In such a case, the length of the stream, the volume of water in it, the extent of each ownership along the banks, the character of the soil owned by each contestant, the area sought to be irrigated by each—all these, and many other considerations, must enter into the solution of the problem; but one principle is surely established, namely, that no proprietor can absorb all the water of the stream so as to allow none to flow down to his neighbor."

It might occur that a riparian proprietor could not

irrigate his land successfully, but he could not on that account deprive others more advantageously situated of the privilege, provided, of course, his own reason-able uses of the water were not impaired.

"The mere fact that the riparian proprietor is deprived of the full flow of the stream adjacent to his land would furnish no basis for compensatory damages. Merely diminishing the volume of water in the stream would not deprive the owner of property for which he could lay claim to a pecuniary compensation. At most, the naked right to the full flow of the stream, and its loss by diminishing the volume of water when appropriated for irrigation purposes, could result only in *damnum absque injuria*. In order to entitle the riparian owner to compensation, he must suffer an actual loss or injury to the use of the water which the law recognizes as belonging to him, and to deprive him of which is to take from him a substantial property right. It is for an interference with or injury to his usufructuary estate in the water for which compensation may rightfully be claimed where the water of the stream is diverted and appropriated for the use of irrigation. It is such a taking of or damage to property as materially and substantially depreciates the value of the real estate of which it forms a part." (*Crawford Co. v. Hathaway, supra.*)

In other words, a diminution of the flow of water over riparian land caused by its use for irrigation purposes by upper riparian proprietors occasions no injury for which damage may be allowed unless it results in subtracting from the value of the land by interfering with the reasonable uses of the water which the landowner is able to enjoy.

In section 602 of volume 3 of Farnham on Waters and Water-rights it is said:

"All conceptions of riparian land lead to the conclusion that it is land which is tributary to, and lying along, a watercourse, and, as soon as the 'divide' is passed and the watershed of another stream is reached, the land cannot be regarded as riparian with reference to the former stream. And since the right

Clark v. Allaman.

to irrigate depends upon the land being riparian the destruction of the riparian character destroys the right to irrigate."

Within these limits the principles of equality of right announced above should control the use of water for irrigation purposes by those whose land is affected by the presence of the stream, irrespective of the accidental matter of governmental subdivisions of the land.

"It would seem, therefore, that any person owning land which abuts upon or through which a natural stream of water flows is a riparian proprietor, entitled to the rights of such, without regard to the extent of his land, or from whom or when he acquired his title. The fact that he may have procured the particular tract washed by the stream at one time, and subsequently purchased land adjoining it, will not make him any the less a riparian proprietor, nor should it alone be a valid objection to his using the water on the land last acquired. The only thing necessary to entitle him to the right of a riparian proprietor is to show that the body of land owned by him borders upon a stream. This being established, the law gives to him certain rights in the water, the extent of which is limited and controlled less by the area of his land than by the volume of water and the effect of its use upon the rights of other riparian proprietors. By virtue of the ownership of land in proximity to the stream, he is entitled to a reasonable use of the water, which is defined as 'any use that does not work actual, material, and substantial damage to the common right which each proprietor has, as limited and qualified by the precisely equal right of every other proprietor.' " (*Jones v. Conn*, 39 Ore. 30, 39, 54 L. R. A. 630, 634, 64 Pac. 855, 87 Am. St. Rep. 634.)

The judgment in favor of the plaintiff cannot be justified on the ground of prescription. Her acceptance and use of water flowing down Rose creek to her land involved the exercise of a right which she herself possessed, without encroachment upon the rights of upper proprietors, and they lost all property in the

water when it left their land. Hence, her conduct lacked the adversary quality necessary to the foundation of prescriptive rights. (3 Farn. Wat. & Wat.-rights, § 646; *Crawford Co. v. Hathaway, supra.*) Nor can any of the upper riparian proprietors in this case claim prescriptive rights against any of their neighbors below, since from the findings of fact it appears that until quite recently there has been water enough for all.

"Where it appears that defendant's use of the water of a stream for irrigation purposes was not so extensive as to render the water-supply of plaintiff, a lower riparian owner, insufficient, such use by defendant is not so adverse to plaintiff's right as to form a basis for a claim of title by adverse user. *North Powder Milling Co. v. Coughanour,* 34 Ore. 9, 54 Pac. 223." (*Boyce v. Cupper,* 37 Ore. 256, 61 Pac. 624. See, also, 3 Farn. Wat. & Wat.-rights, § 646.)

The judgment of the district court is reversed, and the cause remanded with direction to enter judgment against the plaintiff for costs.

All the Justices concurring.