# City of Louisville et al. v. Tway et al.

April 25, 1944.

Rehearing Denied June 6, 1944.

Hubert Meredith, Attorney General, for appellant Commonwealth.

Lawrence Poston for appellant City of Louisville.

Lee Hamilton for appellant State Board of Health.

James W. Stites for all appellants.

Woodward, Dawson & Hobson, Charles I. Dawson and J. Matt Chilton for appellees.

OPINION OF THE COURT BY MORRIS, COMMISSIONER— Affirming.

Appellants, plaintiffs below, are State Board of Health, Jefferson County Board of Health, City of Louisville and William Marshall Bullitt; appellees, de-

fendants below, R. C. Tway, Mrs. S. A. Hert and her farm manager. The petition gives a comprehensive description of the properties involved, accompanied by numerous maps and photographs. It sets out the functions, duties and powers of the health boards in respect of the health and welfare of the public.

The complaint of the owners of Oxmoor, the Bullitt farm of 1,180 acres, is of personal nature. It was charged by all plaintiffs that due primarily to the conduct of Mr. Tway, secondarily of Mrs. Hert, a stream of water which formerly flowed freely through the Tway farm, across the Hert farm, thence to the Bullitt farm, had been polluted to the nuisance of the occupants of the Bullitt farm, and all lower riparian owners. Aside from this the claim of Mr. Bullitt is that he has been deprived of the use afforded by the usual flow of the stream by the activities of Mr. Tway and Mrs. Hert, a like claim being made on behalf of riparian owners beyond the Bullitt farm.

The stream involved is the southern branch of the Middle Fork of Beargrass, which, it is alleged, rises somewhere near Middletown (to the east), pursuing its course westwardly through the Tway farm, the Hert farm, across the Bullitt farm to its junction with the northerly branch, thence to main Beargrass. Both forks run through the Bullitt farm; the other stream was involved in the companion Cook case, appeal recently dismissed.

It is claimed that the usual natural course of Middle Fork has been as described for more than 100 years as a definite and important stream, running westwardly through and from the involved farm through Seneca and Cherokee Parks and to the eastern part of the city. The charge is that the natural and usual flowage had been both impeded and polluted by the acts of the defendants. The charge of pollution would not only affect the use of the private owner, but would affect the public which perhaps justified the joining in the suit by the city and the health authorities.

The Hert farm (1024 acres) lies between the Tway farm (510 acres) and Oxmoor. Mr. Tway operated a considerable dairy business, and it was charged that he permitted milk waste, washings from his dairy floors and seepage from manure pits to pass into the stream. We need not go into further detail as to the pollution

charges, since during the progress of the trial Mr. Tway agreed to entry of an order perpetually enjoining him from doing such things as caused pollution.

The specific acts, aside from pollution charges, were that Mr. Tway had built a large concrete dam across the stream, which impounded the water in a large pool for his own use, thus preventing the natural flow across the Hert farm to Oxmoor. That below the dam there was a spring, waters from which naturally flowed into Middle Fork, appropriated by piping the flowage into a concrete reservoir, and a large standpipe, which with water from another spring, "together with other water from the Water Company's mains, he has used in the operation of his dairy."

It was alleged that Mrs. Hert had erected eleven separate dams across the stream between the point where it enters her farm and Oxmoor. This had the effect of creating a series of large and small pools which held the water from its natural flow, and (aside from aggravating the pollution situation) preventing natural flow, to the injury of the lower riparian owners. Further, that on the Hert Farm there was a free flowing spring, the natural course carrying its water into the stream, but that she had built a reservoir into which she had diverted "and uses the water impounded for her own purposes."

Summing up, it was alleged that Middle Fork "where it enters Oxmoor, had prior to 1932 a flow of pure water, whereas it has now, in normal times, been reduced to no flow whatever, with a few shallow * * pools." On the foregoing brief, but substantially stated allegations, the court was called upon to declare the rights of interested parties; to require Mr. Tway and Mrs. Hert to remove the dams across the stream; to destroy and remove reservoirs or other structures so that natural flowage may be restored and be perpetually enjoined from erecting structures in the future which might impede the flow of water.

Separate answers were filed, in each instance by way of specific denials, and such affirmative pleas as apparently raised issues under the law as we construe it. We might say that Mrs. Hert was engaged in general farming and stock raising, having generally 400 head of live stock on the place, and Mr. Tway, in addi-

tion to his dairy venture, had much live stock. Mr. Bullitt had a yearly average of about 400 head of stock on Oxmoor.

There was a mass of evidence heard, with many exhibits by way of photographs, aerial and otherwise, and documentary evidence, letters, reports, etc. The fact that the greater part went to the matter of pollution, the results and effect, and that the Cooke case was heard cotemporaneously, enlarged the volume of evidence. The only issue remaining after the pollution question was eliminated, and after it was shown that Mrs. Hert had removed the alleged dams, with the single exception hereafter noted, was and is the diversion of waters.

At the conclusion of proof the chancellor made tentative findings for counsel on either side to "shoot at;" which they did. He took up the cases with a full (and free) discussion with counsel on each point involved, and summing up indicated his purpose to hold that plaintiffs had not shown themselves entitled to injunctive relief, and found the preponderance of evidence to favor defendants.

After much colloquy between counsel and chancellor it was agreed that parties, counsel and the chancellor, should inspect the situation on the Tway and Hert farms, and this agreement was carried out. Following the inspection the chancellor in a written extension of his tentative findings, first dealt with the Cooke situation. As to the Hert place he found "there is no water appropriated from the spring on the Hert place, since she had installed city water and discontinued use of the spring, the water from which flows ultimately into Beargrass. There is a 14x14 inch concrete box covering a city water pipe to the Hert barns; the court finds as a fact that this does not appreciably affect the flow of water in the creek." As the result of several hours "rambling with counsel over the Tway place, and up to the water shed east of Moser Lane," the chancellor found that this branch of Beargrass is not a stream until after the surface and spring water passes "under and to the west of Hurstbourne Lane," near the Hert place. Up to the Lane the water flows in eroded channels, an extensive surface flow rather than a stream. The exact point at which the drainage becomes a stream the court fixed at a point near Hurstbourne Lane, though he

thought it might have been fixed at Moser Lane (further east). That the Tway dam "does impound, but does not appropriate surface or spring water. He does pump from two springs in dry season," using a substantial part for commercial purposes, though he found as a matter of fact that neither the impounding nor the appropriation appreciably affected the flow of water beyond. "The headwaters of this south branch are located in a drainage area too extensive, and the flow of the branch and in the lower creek are too far dependent upon a 'run off' feed to admit of conclusion that Tway's operation affects materially the flow of water below his place."

The chancellor expressed the belief that the Tway disposal system was efficient, but remarked that "if not the injunction would take care of that matter," which he thought "was really the important aspect of the case." We are inclined to agree with his conclusion, after a survey of the testimony. This applies to the city and health officers, whose efforts went no further than an unsuccessful attempt to show that to some extent the diversion of water on Plainview and Hurstbourne would decrease the flow through the parks, and to fasten on the pools on the two places liability for the great number of mosquitos infesting the county. Of course, if the court's conclusion that the flowage was not materially retarded was correct, then the authorities have little ground to stand on.

Counsel seem to agree on the law relative to the rights of riparian owners, but not to its application by the chancellor. It is true, as suggested by counsel for appellant, that our court is committed to the "natural flow rule" though as we read the two rules (Reasonable Use) as set out in Restatement-Torts, Vol. 4, pp. 342-344, together with comments, the distinction is rather close, and even under what may be termed the more restricted theory, (text supra) each riparian owner is recognized as having a privilege to use the water to supply his natural wants, and extraordinary or artificial uses, so that such does not sensibly or materially affect the quantity of the water and such uses by a lower riparian owner. The unreasonable use is treated in Sec. 952, p. 357, text supra, in which it is said that before one riparian owner is subject to liability his use of the water must be unreasonable in respect to the riparian proprietor who is harmed by it. This seems to be the

theory adopted by this court in Anderson v. Cincinnati Southern Ry., 86 Ky. 44, 5 S. W. 49, 52, 9 Am. St. Rep. 263, and adhered to up to this time. In that case the court conceived the question to be, "not whether the railroad company made an unreasonable use of the water, but whether its use, for the purposes of the railroad, injured the mill below." The mere detention of the water is not of itself the injury. It must be such as affects the lower riparian owner. The same rule seems to have been applied in Redman v. Forman, 83 Ky. 214, and definitively in Kraver v. Smith, 164 Ky. 674, 177 S. W. 286; Juett v. Renaker, 13 Ky. Law Rep. 782. Appellant points to Fackler v. Cincinnati, N. O. & T. P. R. Co., 229 Ky. 339, 17 S. W. 2d 194, 195, as "roughly" stating the rule to be: "It is the general rule that a riparian proprietor is entitled to have the water of a stream to flow to his land in its natural course undiminished in quantity and unimpaired in quality."

The writer of that opinion did not see fit "to go into the law governing the right of riparian owners or general rules governing the water in streams," since there the court was giving construction to and application of a covenant in a deed between the parties.

It is not necessary to go into the law of the case to further extent. This case started out with alarming magnitude, but as it progressed it softened to a considerable extent, so that when the chancellor came to rule he found little left of the original complaint. The city authorities failed to fortify any alleged pro bono publico claim except as to pollution. Mr. Bullitt was somewhat ameliorated when the pollution question was, at least, temporarily settled, and Mrs. Hert removed all "decorative" dams.

There was a failure to show that either Mrs. Hert or Mr. Tway made unreasonable use of the water from the stream or springs, and there is not sufficient evidence that the acts charged seriously or unreasonably amounted to such injury to the lower riparian owner (or owners) as would entitle them to an injunction. The chancellor found as matters of fact that Mrs. Hert appropriated no water from her spring, and that the remaining dam did not appreciably affect the flow of water in the branch. As to Mr. Tway: "His dam does impound some water (surface) and pumps from his springs in dry seasons, but that neither act appreciably affects

the flow in the branch below." The chancellor sat through three or four days hearing the proof; he heard and saw the witnesses; he visited the premises at insistence of counsel for appellant, with free consent of the appellees.

The rule is that if the court has no more than a doubt as to the finding of fact by a chancellor, his conclusion must be upheld. Russell v. Hogan, 282 Ky. 764, 140 S. W. 2d 615.

The chancellor apparently made a careful observation of the situation upon his visit, with opportunity for parties and counsel to point out objects, not only on the Tway and Hert places, but to Cooke's place and Oxmoor. After his second visit he tightened up his tentative findings. These personal observations, illuminative of the evidence, lends considerable weight to the findings of the chancellor. Collins v. Pigman, 292 Ky. 240, 165 S. W. 2d 955; Roberts v. Burkhart, 290 Ky. 136, 160 S. W. 2d 644. We indulge the opinion that the finding by the chancellor was not against the weight of the evidence; in such cases we do not reverse. Craddock v. Kaiser, 280 Ky. 577, 133 S. W. 2d 916; Crook et ux. v. Feller et ux., 291 Ky. 169, 163 S. W. 2d 476. If perchance we may be in error as to estimation of the weight of evidence, then the "no more than doubt" rule assuredly applies.

Judgment affirmed.