## Bradley et al. v. Williams.

March 25, 1947.

R. C. Littleton, Judge.

Theobald & Theobald and Wilson, Harbison, Kessinger, Lisle & Bush for appellants.

Dysard & Dysard and Howard Van Antwerp for appellee.

OPINION OF THE COURT BY JUDGE SILER—Affirming.

Certain creditors of S. M. Bradley, an adjudged bankrupt, filed this suit by their salvage agent or trustee, E. Paul Williams, the appellee, in which they, after first asserting their total ownership of all stock in a corporation known as Soldier Clay and Asphalt Company, sought a cancellation of that company's lease made to its lessee upon its property.

Subsequent pleadings brought into this suit S. M. Bradley himself, Clara Anita (Mrs. S. M.) Bradley and their son, S. M. Bradley, Jr., the latter two being the present appellants, and all these three joined issue with appellee on the question of the legal ownership of the stock of this same company by denying such ownership as to appellee and by asserting such ownership as to themselves.

Appellants' general demurrer to appellee's petition was overruled, and thereafter upon submission of the whole case for a final judgment, appellee elected to dismiss his cause of action so far as it sought cancellation of the lease in question. Whereupon, the chancellor proceeded to adjudicate only one question directly affecting appellants and appellee, that question being the one relating to the corporate stock ownership of these parties in this company, and judgment having been rendered declaring a complete ownership of this company's stock to be in appellee, Mrs. Bradley and her son then perfected this appeal.

Appellants now contend, in main substance, that the chancellor's judgment should be reversed because

he erred (1) in overruling their general demurrer to appellee's petition and (2) in rendering judgment on the question of this corporate stock ownership after a dismissal of appellee's main cause of action seeking lease cancellation and (3) in adjudging that any valid, legal sale to appellee for the corporate stock in question arose out of S. M. Bradley's bankruptcy proceedings and (4) in adjudging, under all the evidence produced, that the corporate stock ownership in question is now completely vested in appellee.

Since the ultimate issue of this case turned out to be simply a question of the ownership of Soldier Clay and Asphalt Company, we shall strive to set out only such facts as relate to that particular question.

Soldier Clay and Asphalt Company was organized in 1914. Its capital structure consisted of 550 shares of common stock. The stock certificates were issued, as of January 26, 1915, to S. M. Bradley, who was elected president of the company, and to three other original stockholders. S. M. Bradley, according to his own testimony, eventually bought out the other stockholders and thus became owner of all 550 shares of stock. Transfer of this complete ownership to S. M. Bradley was accomplished by delivery of all stock certificates to him, all of which were, sooner or later, endorsed in blank on the reverse sides by the original holders. But no new stock certificate was issued to S. M. Bradley.

Now S. M. Bradley was, at one time, somewhat of a tycoon, a man of extensive interests and affairs. In this record, he was called "senator" by counsel and therefore we assume that he held title to that office sometime and somewhere. He was president of Morehead State Bank until it closed its doors in 1928. He was treasurer of Morehead State Normal School until an audit disclosed a substantial shortage of his accounts with that institution. He was a real estate man, timber dealer, trader, business leader in the encircling activities of his operative enterprises. We have not been given the explanatory keynote of the collapse of his financial domain. But, in any event, his bank closed and then followed almost immediately a claim for $194,000 against him and his surety companies by reason of his school fund shortage.

Accordingly, upon the initiative of his surety companies, which began closing in upon him and his assets, he and Mrs. Bradley jointly made a voluntary agreement of property assignment. This assignment was drawn in writing, was dated November 22, 1928, was made to H. R. Dysard as a trustee for the surety companies and other creditors, was based upon a definite purpose of paying all claims in full. A schedule of assets accompanied this assignment and listed a total valuation of all the Bradley property, both real and personal, in a sum of more than half a million dollars. According to this valuation, S. M. Bradley was in a state of happy solvency and all clouds of creditors' concern were totally unjustified in the fair weather status of his financial condition of 1928. There appear to have been set forth among the listed assets of this assignment schedule certain clay and asphalt deposits located at Soldier, Kentucky, which is the identical location of the physical property of this same Soldier Clay and Asphalt Company. These clay and asphalt deposits were valued at $140,000 in the schedule. In completing his voluntary assignment, S. M. Bradley addressed and signed a letter from himself to Soldier Clay and Asphalt Company. And in this letter he indicated, although in a rather indefinite way, that he himself owned all shares of stock in this company. H. R. Dysard testified, in substance, that S. M. Bradley represented that he in fact owned individually all the stock of this company at the time of this voluntary assignment.

This assignment arrangement dragged along in a manner which was tedious, unsatisfactory, painfully unremunerative to the Bradley creditors until 1935. Liquidation of assets was slow. Payments to creditors were small. Consequently, a federal court receivership of the Bradley properties replaced, in 1935, the previous, voluntary assignment of 1928. W. H. Dysard became court receiver in place of the 1928 assignment trustee, H. R. Dysard. Presumably, all things else were unchanged. The debtor, the creditors, the assets, the debts, the purpose at hand all remained unchanged.

Doubtless this federal court receivership likewise proved to be unsatisfactory to some interests, maybe to the creditors, likely to the debtor, perhaps mutually to them all, because bankruptcy proceedings followed in

1937. And as a net, legal result, all the S. M. Bradley property ownership, whatever and wherever it was, then became vested in his trustee in bankruptcy. His debts became, as they were proven and filed, claims in bankruptcy. Their total amount was nearly $180,000. The final bankruptcy payment to creditors was equivalent to 4% on their claims. The federal court receiver, W. H. Dysard, became the official trustee in bankruptcy. The bankrupt was eventually discharged in bankruptcy court in 1939 and the estate of the bankrupt was finally closed up in 1940.

Along in the process of closing up the bankrupt estate, such creditors as chose to do so organized a salvage plan, financed it with their bankruptcy dividends, elected a salvage agent or trustee in the person of E. Paul Williams, this appellee. Thereupon, the bankruptcy trustee conducted a sale of all the bankrupt's interest in Soldier Clay and Asphalt Company. This sale was made at public auction, at which S. M. Bradley himself bid $5, at which appellee bid $6. This sale of the bankrupt's interest in Soldier Clay and Asphalt Company at $6 to appellee was duly confirmed on July 13, 1940, and appellee received a bill of sale from the bankruptcy trustee on July 17, 1940.

But long before these later developments, it appears that S. M. Bradley had, in 1924, begun an indebtedness to a bank in Huntington, West Virginia, in the approximate, original amount of $40,000. And in order to secure payment of that debt he had pledged practically all outstanding stock of Soldier Clay and Asphalt Company. The stock had accordingly remained in pledge to that bank through all those years until April 8, 1937. Therefore, because of previous pledge to creditors, the Soldier Clay and Asphalt Company stock was never manually delivered to the 1928 assignment trustee nor to the 1935 court receiver nor to the 1937 bankruptcy trustee nor to the 1940 salvage trustee. But, on the date of April 8, 1937, which was 32 days after the bankruptcy adjudication, two of S. M. Bradley's friends, T. P. Bradley and C. M. Grimes, took over the Huntington bank indebtedness and its pledged security consisting of most of the outstanding stock of Soldier Clay and Asphalt Company. And so, in the closing up processes of the bankrupt estate, the bankruptcy court, on September 23,

1940, made a further order which purported to release all rights then outstanding against whatever securities T. P. Bradley and C. M. Grimes had come to possess as security for their debt, that is the debt they had purchased from the Huntington bank on April 8, 1937. The securities possessed by T. P. Bradley and C. M. Grimes were, of course, the outstanding shares of stock, or most of them, in Soldier Clay and Asphalt Company.

Appellants are apparently claiming their title to the stock of Soldier Clay and Asphalt Company through (A) transfers of ownership which were made by S. M. Bradley to appellants in 1926, according to their evidence, and also through (B) the legal effect of the bankruptcy court's relinquishment order of September 23, 1940.

Appellee is apparently claiming his title to this same stock through (A) transfer of ownership from S. M. Bradley and Mrs. Bradley to the 1928 trustee, thence to the 1935 receiver, thence to the 1937 trustee and also through (B) the 1940 bankruptcy sale to appellee, which sale was duly confirmed by the bankruptcy court.

Eighteen pleadings were filed in this case. And a great quantity of evidence, some of it very nebulous, was produced in support of the various contentions promulgated. Even after studying this case at considerable length, we feel as if we are seeing it "as through a glass darkly," as the Apostle Paul once expressed himself. Nevertheless, we have attempted to set out above what appear to be the issues and the summarized facts bearing upon those issues, as we have gathered them from the volumes of this record. We now take up in sequence the main questions raised by appellants on this appeal.

1. Did appellee's petition state a cause of action? Appellants contend that appellee's petition was defective in stating conclusions rather than facts. The petition alleged, in substance, that appellee had title to at least 132 shares of the stock in question and that he was asserting ownership to all 550 shares of such stock. We have heretofore held that an allegation of an ownership to property is not such an averment as to constitute a mere conclusion of law. See Louisville & N. R. Co. v. Scomp, 124 Ky. 330, 98 S. W. 1024. Appellants cite no authority on this point. Accordingly, we believe that

appellee's petition did state a legal cause of action and that the chancellor correctly overruled appellants' demurrer.

2. Did the chancellor have legal right to render judgment as to this stock ownership after the dismissal of appellee's main cause of action seeking cancellation of a lease? Appellants' pleadings show that they denied appellee's ownership of this stock and asserted such ownership in themselves. Their pleadings closed with prayers that appellants be adjudged as owners of this stock. Again, appellants cite no authority on this point. However, there seem to be authorities holding that a plaintiff can not, by dismissing his cause of action contained in his petition, defeat a right of trial on a cause of action set up in his defendant's counter pleading and by which a counter relief is sought for such defendant. See Rose v. Finley's Ex'r, 250 Ky. 769, 63 S. W. 2d 948, and cases cited therein. Applying this established principle, it is now incumbent on us to declare that the chancellor correctly adjudicated the question of this stock ownership, notwithstanding the previous dismissal of the main cause of action set up in appellee's petition. After all, appellants had sought a solution of this very question, albeit with different result than that reached by the chancellor.

3. Did any valid, legal sale of this stock to appellee arise out of the bankruptcy proceedings? Appellants contend that the bankruptcy trustee had no right to make a sale because the stock was not in possession and was not free from the shadow of its encumbering lien. In one case cited by appellants themselves they quote these words, "In the first case (the case of a bankrupt's encumbered property in which there appeared to exist some equity value above its lien), the trustee should proceed to liquidation by sale of the property." In re Hagin, D. C., 21 F. 2d 434, 438. On the basis of that very authority, this bankruptcy trustee seems to have done what he had a perfect right to do, that is to "proceed to liquidation by sale." Of course, neither the bankruptcy procedure nor any other legal machinery had any right to erase the validly existing, prior lien of the bankrupt's bona fide creditor. This was not attempted. There was no encroachment whatever upon the welfare of this bankrupt's lien creditor, which was

eventually satisfied, if we understand this record correctly. Only the bankrupt's *equity* was sold or attempted to be sold in the bankruptcy proceedings. No lien was even slightly disturbed.

A bankrupt's property, even though subject to a valid lien, vests within the bankruptcy trustee, who, however, acquires the property still saddled with such lien. The right of actual possession of such encumbered property is controlled by the contract itself which was made between the original owner, the bankrupt, and his creditor. See 6 Am. Jur. 631.

We can understand that this sale could not have been made in a manner which would have ignored a validly existing lien with a priority status. But the happenings of this sale presented no such situation. This sale affected only that interest, the equity value above any lien, which the bankrupt had in this Soldier stock, nothing more. It passed title to an equity. It neither hurt nor helped any lien holder.

As to the bankruptcy court's relinquishment order of September 23, 1940, it is proper to say that this appears, on its face, to have been inconsistent with the court's previous act of selling this same property, the relinquished property, more than two months prior thereto. In other words, the bankruptcy court sold the bankrupt's equity in the Soldier stock on July 17, 1940, and then apparently relinquished, on September 23, 1940, the same stock to the lien holders, no doubt having overlooked the fact that a disposition of the stock had already been made by an approved sale. If those two acts were inconsistent, as they seem to have been, then the first act, which we believe was done in all legality, vested in appellee a valid title which could not have been divested by the inadvertence or inconsistency of the second bankruptcy order of later date. There was nothing to relinquish at the time of the later order, because the thing sought to be relinquished had already been sold. According to the old saying, "you cannot have your cake and eat it too." In this instance, the cake had been eaten by the sale of July 17, 1940, and there was not one crumb left in the cupboard on September 23, 1940.

For the reasons indicated, we believe that a good

title of an equity interest legally passed to appellee under the bankruptcy sale of July 17, 1940.

4. Does this record contain competent evidence sufficient to support the chancellor's judgment declaring this stock ownership to be now vested entirely in appellee? The law is well and firmly established upon the solid rock of a great many decisions to the effect that this court follows the judgment of the chancellor in instances where this court has no more than a doubt as to the legal righteousness of his judgment. A few of the later decisions upholding this principle are: Williamson v. Phillips, 297 Ky. 285, 179 S. W. 2d 603; Grigsby v. Mosley, 297 Ky. 571, 180 S. W. 2d 99; City of Louisville v. Tway, 297 Ky. 565, 180 S. W. 2d 278; Cole v. Landrum, 297 Ky. 735, 181 S. W. 2d 253; Duff v. Fordson Coal Co., 298 Ky. 411, 182 S. W. 2d 955.

In the instant case, we found evidence indicating that S. M. Bradley, who knew the situation better than any one else, represented in 1928 that he himself owned all this Soldier stock. We also found evidence that both S. M. Bradley and appellant Mrs. Bradley joined in an instrument of assignment in 1928 by which they made their property, including the Soldier property and stock, available for full satisfaction of the Bradley creditors. The chain of appellee's title to the soldier stock seems to lead directly and unbrokenly back to the 1928 representations and to the 1928 assignment.

While S. M. Bradley, Jr., offered some evidence of a transfer of some of this stock ownership to himself in 1926, yet it was established that he was only nine years old at that time and had nothing or practically nothing in the way of an estate of his own. If he received any transfer of this stock ownership back in 1926, it was a sort of transaction underneath a bushel. It was not like a candle set on a hill. The stock transfer book of the company did not record this transaction until 1930, and this was two years after his parents had made an assignment of all property, which either included or should have included the Soldier stock, to the Bradley creditors in 1928. S. M. Bradley was unable to fix the exact date of the transfers to his wife and son. Neither was he able to fix the exact amount of the consideration for such transfers. And although Mrs. Bradley produced a writ-

ten instrument from S. M. Bradley to herself in support of her claim that there had been a transfer to herself in 1926, yet S. M. Bradley, Jr., produced no similar writing to himself. And so, on the whole, we believe there was sufficient evidence to support the chancellor's judgment, which disregarded the claims of Mrs. Bradley and her son to the stock in question and which upheld the claim of the appellee to the same stock. In any event, we could have no more than a medium sized doubt as to whether or not the judgment is correct.

Wherefore, having found no prejudicial error militating against the substantial rights of the appellants, the judgment of the chancellor is now hereby affirmed.