No. 37,509

JOHN C. HEISE, *Appellant,* v. LEWIS E. SCHULZ, C. O. LUTZ and JOHN BOONE, *Appellees.*

(204 P. 2d 706)

Opinion filed April 9, 1949.

*Corwin C. Spencer,* of Oakley, argued the cause, and *Jerry E. Driscoll,* of Russell, and *J. H. Jenson,* of Oakley, were with him on the briefs for the appellant.

*James E. Taylor,* of Sharon Springs, argued the cause, and *Elmer E. Euwer,* of Goodland, was with him on the briefs for the appellees.

The opinion of the court was delivered by

ARN, J.: Plaintiff seeks a mandatory injunction to compel defendants to remove certain dams which they have placed in and across the bed of Eagle Tail creek. The trial court made findings of fact, refused the mandatory injunction prayed for by plaintiff, and rendered judgment for defendants. The plaintiff has appealed. For convenience we will refer to the parties as plaintiff and defendants, as they appeared at the trial below.

The plaintiff's petition prayed for a mandatory injunction commanding the defendants to immediately remove all of their manmade obstructions in and across Eagle Tail creek which diminish the natural flow of water in said stream, and that defendants and their agents and representatives be perpetually enjoined from damming, obstructing or diminishing the natural flow of said stream onto plaintiff's land, except that defendants may make such use of the waters in said stream as they are entitled to make without injury to plaintiff or his property.

Eagle Tail creek is a small stream which originates in and meanders through Wallace county. About 1909 the Union Pacific Railroad Company erected a dam in the NE ¼ of section 6, township 14, range 40, on said stream for its use and diversion for railroad purposes in the vicinity of Sharon Springs. The railroad properly acquired from the predecessors in title of all parties to this action its right to construct the railroad dam, and the existence of the railroad dam is not challenged in this lawsuit. Below this dam the stream meanders northeast into section 31, township 13, range 40, owned by the defendant Boone, thence east through the west half of section 32 owned by defendant Lutz, thence through the east half of section 32 owned by defendant Schulz, and then through

section 33 owned by the plaintiff. All of said lands were patented by the United States to predecessors in title of the present owners thereof at various times after March 13, 1891, as shown by the public records of Wallace county. The plaintiff acquired and began occupying his land in January, 1941. There are five dams on the Boone land, six dams on the Lutz land, and two dams on the Schulz land, all of which are located in Eagle Tail creek in that order below the railroad dam. The first dam on the Boone land is 2,879 feet below the railroad dam. The other dams are from 321 feet to 2,100 feet apart across the defendants' two sections—and the last dam on the Schulz land is 3,200 feet above plaintiff's west line. As to the foregoing general situation, there is no dispute, but in the development of the further facts there was some conflict in the testimony upon which the trial court made findings. On the next day after hearing all of the testimony, the trial judge of the court below made a personal inspection and view of the stream along and across all of the land here involved and along the greater part of the stream's course.

Most of the findings made by the court below are sufficiently important to give space:

"(3) The court further finds that all of the real estate above described was patented by the United States of America to predecessors in title of the owners of the above lands at various times after March 13, 1891, as shown by the public records of Wallace county, Kansas. . . .

"(7) The court further finds that Eagle Tail Creek has at all times, as indicated by the records and the testimony in this case, been an intermittent flowing stream in its channel. The amount of water flowing in said channel has been largely governed by the season of the year or the precipitation falling in the immediate vicinity of the stream. It generally flows in the winter months and is dry in the summer months.

"(8) The court further finds that like a good many other Western Kansas streams, it largely went to pools or ponds, varying in depth from a foot to several feet, where the water would stand in seasons when the stream was not running, and that the dams complained of are obstructions placed at the lower or downstream side of said natural ponds or pools that had existed in said stream for many years, and that they consist of surface obstructions only.

"(9) The court further finds that the soil along said stream may be described as a sandy or porous soil, and that all of the parties along said stream have used said water for domestic use and for the purpose of subirrigation and as cattle water.

"(10) The court further finds that the annual rainfall of Wallace county, Kansas, is approximately 16.5 inches. That the annual rainfall for each of the years after the acquisition of title by the plaintiff to his land, according

to the records of the United States government weather observer at Sharon Springs, Kan., is as follows:

| | |
|---|---:|
| 1941 | 24.35 |
| 1942 | 19.76 |
| 1943 | 13.39 |
| 1944 | 18.86 |
| 1945 | 15.34 |
| 1946 | 17.62 |
| 1947 | 17.79 |

"(11) The court further finds that the vegetation along said stream and on the real estate adjacent thereto, and, in general, over Western Kansas, has increased considerably during the years since 1941. That the runoff of water is not as great as it was previously; that flood waters have been at a minimum.

"(12) The court further finds that the defendant John M. Boone has constructed upon the real estate owned by him five dams or obstructions at the end of old water holes, ponds or depressions in the creek bed. That said dams are very small obstructions or low water devices which tend to dam back *excessive* water in said holes and to impound water and to spread or force the same by subirrigation to meadowland along the creek channel. That said John M. Boone has about sixty acres of alfalfa growing along the stream. That he operates said land as a farming venture. That he keeps from thirty-five to sixty head of livestock in the summer.

"(13) The court further finds that the defendant C. O. Lutz has constructed at the end of pools or ponds or depressions in the channel on his real estate six obstructions or dams which tend to hold back water and to impound and force the same by subirrigation into the surrounding meadowland. That said land is used for agricultural purposes. That all of the land along the banks of the creek is meadow or hay land. That there is pastured on said real estate thirty-five to seventy head of livestock. That, if said dams are removed, defendant Lutz will be without water facilities in summer months to care for said livestock.

"(14) The court further finds that the defendant Lewis Schulz moved upon his land in 1946, and is living there. That he keeps a small herd of cattle, normally fifteen to twenty-five head. That he has two dams on his premises. That said dams or obstructions are small in size and similar to the construction of the other dams. That except for said dams said defendant Schulz would be without water for livestock except from wells.

"(15) The court further finds that said alfalfa land of Boone and his plowed land is located on the West Half (W½) of Section Thirty-one (31); that the East Half (E½) is in its natural state. That all of the land on the Lutz half section is in its natural state of meadowland and prairie grass along the creek bank and for a substantial distance each way from the banks.

"(16) The court further finds that the plaintiff John Heise has cultivated land adjacent to the creek bed almost all the way across his land, which has naturally caused the stream to silt up to quite a degree.

"(17) The court further finds that the dams in question in this case were constructed over a period of time from the fall of 1943 up to and including the month of May, 1945. No dams have been constructed since that time. That none of the dams in question impound in excess of one acre-foot of

water, except possibly dam No. 3 on plat on the Boone land; and that the water impounded by all of said dams or obstructions is considerably less than ten acre-feet of water; and that all of the land along said stream is used for agricultural purposes; and that the waters of said stream are used for watering livestock and also for domestic purposes, and, to a certain extent, for subirrigating lands adjacent to the stream. That no water is diverted from the stream, except that taken by the Union Pacific Railroad Company.

"(18) The court further finds that for several years preceding this hearing the Union Pacific Railroad Company has operated a water softener plant, which it flushes two or three times a week; that it requires an additional 100,-000 gallons of water for each of such operations; and that its average daily use of waters impounded by the railroad dam is approximately 100,000 gallons.

"(19) The court further finds that the flow of water in Eagle Tail Creek has been gradually diminishing above the railroad dam for severeal years, and frequently, when excess water is being used by the railroad, no water flows over the dam, and at certain dry seasons of the year there has been no flow over the railroad dam for weeks at a time, and it has always gradually diminished in the amount of water both prior to and subsequent to the erection of said obstructions or dams during the period covered by the testimony, as it proceeds down its course.

"(20) The court further finds that during the summer months before the construction of said dams the parties defendant in this action, or their predecessors in title, were frequently unable to get sufficient water for their cattle; and that, without such dams or obstructions, there would be insufficient water for livestock pastured on their lands along said creek. This is true also of the plaintiff, on whose land there was frequently a lack of water for cattle purposes prior to the complained of obstructions, except that the plaintiff has at least one pool, which is fed by springs, which never goes dry; but most of the pasture land of the plaintiff lies away from the course of the stream and is separated from the stream by land which the plaintiff cultivates and farms.

"(21) The court further finds that the complained of dams or obstructions in said stream have not materially reduced the amount of water available to the plaintiff; that the plaintiff maintains a dam on his premises, which is probably as large or larger than any of the dams complained of, and, if the plaintiff has suffered any loss by reason of said obstructions, they are not other or different losses than those suffered by any other owners farther down the stream.

"(22) The court further finds that the plaintiff formerly maintained a well across the creek from his improvements from which he obtained water for domestic uses and for watering livestock; that he has ceased to operate said well. That the underflow or ground water of the creek is across the creek from his improvements and that in all probability ample water for domestic and cattle uses could be obtained from the same source it was formerly obtained from; that he has made no effort to obtain this water from such source. That there is not now and never has been sufficient water on the side of the creek where his improvements are for domestic and livestock

purposes; but there has always been ample water in one or probably two water holes in the creek which have never been known to go dry.

"And the court, having found as a matter of fact that there has been no material reduction in the amount of water passing down Eagle Tail Creek by reason of the obstruction complained of, must, therefore, conclude that the plaintiff has not been damaged by reason thereof, and that the mandatory injunction requested in this case should be, and the same is, hereby refused. That the defendants herein have their vested rights in the use of said water, which can not be disturbed.

"It is therefore ordered, adjudged and decreed by the court that the plaintiff has not been damaged by reason of the damming of Eagle Tail Creek by the defendants and that a mandatory injunction is hereby refused."

Additional findings:

"(1) That the several dams on the lands of the defendants have served to raise the water level in their natural ponds.

"(2) That the defendant, John M. Boone, does not reside upon his land, although it is improved.

"(3) That the old water holes, ponds or depressions in the creek bed behind each of the five dams on the Boone property are now normally filled with water the year around and during the fall, winter and spring months water normally will run in the channel from one dam to the next.

"(4) That the defendant, Boone, has impounded water on his land far in excess of the amount required for his domestic purposes and to water his livestock, his largest dam impounding water 4½ to 5 feet deep by 20 feet across and about ¼th mile long.

"(5) That a considerable quantity of water stands behind each of the dams on the Lutz property the year around, and in the fall, winter and spring months, water normally flows in the channel from one dam to the next, but said water holes have been known to go dry during the summer months."

Plaintiff requested certain findings of fact and conclusions of law. He also moved to amend certain of the court's findings and to vacate others, which motion was sustained in part resulting in the findings as set forth above. Plaintiff also filed his motion for a new trial and it was overruled. On appeal plaintiff argues that the trial court erred in refusing to make findings of fact as requested by plaintiff, but from a careful examination of the complete record we find no basis for his contention. Plaintiff sets forth four specifications of error but states in his argument and brief that they will be presented as one. Stated generally, the plaintiff's contention here is that the findings and judgment of the trial court are not supported by the evidence.

It is apparent from the findings of the trial court, supported by the evidence and by the personal inspection of the stream made by

the trial judge, that Eagle Tail creek generally flowed in the winter months and was dry in the summer months—that even before the construction of the dams complained of, the stream did not flow during dry seasons—that no water was being diverted or wasted by defendants—that defendants' dams did not materially reduce the flow of water downstream to plaintiff's land—that all thirteen dams combined would impound a total of less than ten acre-feet of water behind dams considerably less than ten feet high, and the water so impounded was for beneficial use and domestic purposes. Our examination of the record reveals no basis for a finding, and none was made by the trial court, to the effect that defendants' use of the water was unreasonable. Neither was there a finding that the stream flow through plaintiff's land would have been substantially greater if defendants' dams were eliminated. Without findings favorable to plaintiff in these two respects, plaintiff's case for injunctive relief is weak. Other findings made by the trial court are decidedly favorable to defendants. The district court has wide discretion in matters of equitable cognizance such as the granting or refusing to grant an injunction.

There was evidence that since 1941 the use of water by the railroad from its reservoir upstream was substantially increased; there were more vegetation, trees and crops adjacent to the stream thereby causing a greater use of the water through transpiration; and engineering reports indicated there must have been an increased subterranean flow which would decrease the flow in the stream bed. Defendants argue that all these circumstances may tend to decrease the stream flow through the bed of the channel, and while each such circumstance constitutes a consumptive use, it is neither waste, diversion, nor an unreasonable use; and that if the creation or enlarging of ponds along the stream increases the underground flow, the resulting subterranean irrigation and raising of the water table is advantageous to all adjacent and lower riparian owners and could constitute a reasonable and proper consumptive use of the impounded waters. This is an impressive argument in the light of all the evidence and the findings made by the trial court.

A majority of the cases cited by appellant involve *diversion* of water from the stream by means of channel changes, ditches, and so forth. As has been noted, there was a trial court finding (No. 17) that no water was diverted from Eagle Tail creek by any of the defendants. That finding is supported by the evidence and consequently the foregoing cases are not in point.

Under the common-law doctrine of riparian rights, an upper riparian proprietor may impound water for beneficial use for domestic purposes as long as he does not commit waste, and does not unreasonably use or divert the water away from the lower riparian owners. In any event, a lower riparian owner may not rely upon the common-law doctrine of riparian rights for injunctive relief unless it is first established as a fact that the upper use complained of by him has materially reduced the stream flow onto his land. In the instant case, these matters having been resolved in favor of the defendants, it cannot be said the defendants violated whatever common-law riparian rights plaintiff may otherwise have had.

See Restatement, Torts, Vol. IV, § 849 (pp. 342-346) for analysis of the two common-law theories of riparian rights, as follows:

"This law of Riparian Rights, although originating in this country, found its way into the English cases between 1820 and 1840 and was fully expounded in the classic case of *Embrey v. Owen,* 6 Exch. 353, decided by Baron Parke in 1851. That case is one of the leading cases on the subject and has often been cited and quoted both in this country and in England.

"The application of the principle of equal rights to particular cases has proved a difficult task to most of the courts and there has been no uniform agreement among them as to exactly what is meant by equal rights. A study of the cases discloses two fundamentally different theories or views on the question. One is the theory adopted by the English courts and some American jurisdictions which may be called the Natural Flow or Natural Law theory. The other, adopted by a number of American jurisdictions, is the Reasonable Use theory. An understanding of the cardinal features of each of these theories of Riparian Rights is essential to an understanding of the rules stated in this Topic.

"*The natural flow theory.* Under this theory the primary or fundamental right of each riparian proprietor on a watercourse or lake is to have the body of water maintained in its natural state, not sensibly diminished in quantity or impaired in quality. Each proprietor, however, is recognized as having a privilege to use the water to supply his 'natural' wants, and each also has a privilege to make 'extraordinary' or 'artificial' uses so long, but only so long, as such uses do not sensibly or materially affect the natural quantity or quality of the water, and are made on or in connection with the use of the riparian land. These limited privileges in each proprietor qualify the primary rights of the other proprietors to have the stream or lake maintained in the status quo of nature. Thus, according to this theory of riparian rights, all proprietors have equal rights to have the water flow as it was wont to flow in the course of nature, qualified only by the equal privileges in each to make limited uses of the water. . . .

"The advantages of this theory are that it is relatively more definite and certain, and that each riparian proprietor knows what uses he can or cannot lawfully make of the water. The disadvantages of the theory are that it is non-utilitarian and prohibits many beneficial uses of water although those

uses may be causing no one any harm, and although the water would run to waste if not so used.

"*The Reasonable Use theory.* Under the Reasonable· Use theory the primary or fundamental right of each riparian proprietor on a watercourse or lake is merely to be free from an unreasonable interference with his use of the water therein. Emphasis is placed on a full and beneficial use of the advantages of the stream or lake, and each riparian proprietor has a privilege to make a beneficial use of water for any purpose, provided only that such use does not unreasonably interfere with the beneficial uses of others. Reasonable use is the only measure of riparian rights. Reasonableness, being a question of fact, must be determined in each case on the peculiar facts and circumstances of that case. Reasonableness is determined from a standpoint of a court or jury and depends not only upon the utility of the use itself, but also upon the gravity of its consequences on other proprietors. . . .

"The advantages of this theory are that it is entirely utilitarian and tends to promote the fullest beneficial use of water resources. Furthermore, there are no absolute or technical rights and a cause of action arises only when one proprietor's use of water causes substantial harm to, and an unreasonable interference with, another's use. One need not fear that another is acquiring any prescriptive rights against him until his use has been actually interfered with. The disadvantage of the theory is its indefiniteness. Under it one cannot always be absolutely sure just what uses he can or cannot lawfully make of the water; and even though a use may, in its inception, be reasonable, circumstances may change to such an extent that it will become unreasonable.

"A few courts adopt the full Natural Flow theory, while a few others completely adhere to the Reasonable Use theory. Most courts, either not realizing that there are two distinct theories or not fully grasping their fundamental differences, attempt to apply both theories, with results that are not only illogical but weirdly inconsistent at times."

Also, see, 67 C. J. 917, § 364:

"The damming of a nonnavigable stream is not necessarily, or even prima facie, a public or a private nuisance, for it is fundamental that an upper riparian may reasonably detain and use the waters of a stream flowing through his land. Indeed it has been declared to be the settled policy of some states to encourage the development, by private initiative, of the water power of their streams."

The Kentucky court in *City of Louisville v. Tway*, 297 Ky. 565, 180 S. W. 2d 278, applied the reasonable use theory:

"The distinction between the 'natural flow rule' and the 'reasonable use' theory is very close, and even under the natural flow theory, each riparian owner is recognized as having a privilege to use the water to supply his natural wants, and to make extraordinary or artificial uses so long as such uses do not materially affect the quantity or quality of the water and such uses by a lower riparian owner."

"Under the 'reasonable use theory,' before one riparian owner is subjet to liability, his use of the water must be unreasonable in respect to the riparian

proprietor who is harmed by it, and mere detention of the water is not of itself the injury."

"Evidence failed to show that upper riparian owners made unreasonable use of the water from a stream or spring, and was insufficient to show that the acts charged to such owners seriously or unreasonably amounted to such injury to lower riparian owners as would entitle them to an injunction." (Syl. ¶¶ 1, 2, 3.)

The "reasonable use" theory prevails in the great majority of states where the common-law doctrine has been applied. And this theory, as distinguished from the "natural flow" theory, has been adhered to in this state whenever the common-law doctrine of riparian rights was under consideration by this court. In *Clark v. Allaman,* 71 Kan. 206, 80 Pac. 571, we said:

"The restrictions upon the use of water for irrigation, after the primary uses for quenching thirst and for domestic requirements are subserved, are those which justice and equity suggest. In all cases the use must be reasonable, and the right of each must be exercised with due regard for the equal rights of others." (p. 241.)

In *Frizell v. Bindley,* 144 Kan. 84, 58 P. 2d 95, the reasonable use theory was extended to irrigation:

". . . American courts have not hesitated to declare that, subject to its primary uses of *lavandum* and *potandum,* the use of water of a flowing stream for irrigation is one of the common-law rights of a riparian proprietor. But such right is not one which could be acquired by prior appropriation at common law. It is limited by the equal right of every other riparian owner along the course of the stream to irrigate his lands therefrom; and no prescriptive rights to water for irrigation purposes can be acquired by one riparian landowner to the detriment of other riparian landowners. (*Clark v. Allaman,* supra, syl. ¶¶ 10, 11, 14.) At the instance of a lower riparian owner the courts will grant injunctive relief against an upper riparian who diverts or wastes the water of a flowing stream." (p. 93.)

Holding that a lower riparian owner could enjoin an upper one who diverted waters from a stream without devoting it to any beneficial use, and thus permitted the water to run to waste over a sand bar onto nonproductive land, it was said in *Campbell v. Grimes,* 62 Kan. 503, 64 Pac. 62:

"Some doubts may have existed in the ancient common law as to the right of an upper riparian proprietor to appropriate all of the water flowing through his land, whether necessary to his reasonable purposes or not; but there can be no doubt now that he has no right, as against a lower proprietor, to appropriate any more of the water of the stream than is needed for his own beneficial uses. The uniform holdings of the courts are that he has no such right, and upon the nonexistence of such right plans for the equitable di-

vision of water among riparian proprietors have been devised by statute in all of the states where irrigation can be successfully practiced." (p. 505.)

See, also, *Railway Co. v. Shriver*, 101 Kan. 257, 166 Pac. 519, where the language used is quite applicable to the instant case both as to the question of reasonable use and as to the effect of the trial court's findings and judgment:

"The railway company as a riparian owner had the right to make reasonable use of the water of the stream for the purpose of supplying its engines and operating its railroad. Reasonable use means such use as is consistent with the equal rights of other riparian owners. (*Clark v. Allaman*, 71 Kan. 206, 80 Pac. 571.) In the case cited, abstraction of water from a stream for irrigation purposes was sanctioned. Abstraction of water for railroad purposes by a railway company which is a riparian owner is merely another use, the propriety of which can not be questioned so long as the rule of fairness and equality between owner and owner is observed.

"When water is abundant there is no occasion to dispute about its use. Only when the flow becomes scanty does necessity for adjustment arise. In this case matters were brought to a crisis by an unprecedented drought, which the court felt impelled to classify as an act of God. The court found specifically that the dam did not back water far enough to interfere with the operation of the defendant's upstream mill, and found specifically that the quantity of water taken by the plaintiff did not in any appreciable degree affect the operation of the defendant's downstream mill. These were questions of fact, the solution of which depended on the estimate placed by the court on the evidence, which was conflicting to the point of contradiction. It is not necessary to review the evidence. It has been examined, and that upon which the court must have relied is abundantly sufficient to sustain the findings. Beyond ascertaining this fact, this court on appeal has no function to perform with respect to the evidence." (p. 258.)

The findings of the court below are supported by the evidence. From those findings we must conclude that defendants' use of the waters of Eagle Tail creek was reasonable; that such water was neither wasted nor diverted; and that its use by defendants did not materially reduce the flow of water downstream to plaintiff. It follows that plaintiff was not entitled to an injunction under the common-law doctrine of riparian rights.

In the prosecution of this appeal both sides have relied chiefly upon the common law. However, aside from any application of the common-law doctrine of riparian rights, defendants contend there is another aspect of the case which compels an affirmance of the trial court's judgment in their favor. To support this contention they cite statutes which are said to have modified the common law (G. S. 1935, ch. 42, art. 3, and G. S. 1947 Supp.; G. S. 1935, ch.

82a, art. 3, and G. S. 1947 Supp.; G. S. 1947 Supp., ch. 82a, art. 7). It is true that the evidence before us and the findings of the trial court are that all of the thirteen dams complained of were substantially less than ten feet high, and in each instance the amount of water impounded was much less than fifteen acre-feet. Section 82a-304, G. S. 1935, a part of the act regulating the placing of obstructions in streams and rivers, and one of the statutes stressed by defendants, provides:

"The provisions of this act shall not prohibit the placing in any purely private stream of any dam not more than ten feet high and not impounding more than fifteen (15) acre feet of water."

This statute and others enacted since 1917 (and perhaps since 1911) have undoubtedly modified the common-law doctrine of riparian rights which theretofore had been the basic principle of water rights in this state (*State, ex rel., v. Board of Agriculture*, 158 Kan. 603, 608, 149 P. 2d 604). However, there is no occasion here to discuss the extent to which that common-law doctrine may have been modified by statutory enactments. We know of no statute which would be of assistance or solace to the plaintiff, and since he has failed to establish any right to an injunction under the broader and more elastic common-law doctrine, a further discussion of the statutory rights of defendants would be of little purpose.

The judgment of the trial court is affirmed in accordance with the views expressed in this opinion.