No. 40,162

T. WALKER WEAVER, T. W. WEAVER, JR., RALPH E. COWAN, RALPH RALSTON, CLEE RALSTON and JOHN HYDE, *Appellees,* v. BEECH AIRCRAFT CORPORATION, G. M. FISHER, *Appellants.*

(303 P. 2d 159)

Opinion filed November 3, 1956.

*Dwight S. Wallace,* of Wichita, argued the cause, and *Jimmie E. Grey, Donald C. Tinker, Jr., Getto McDonald, William Tinker, Arthur W. Skaer, Jr., Hugh P. Quinn* and *William Porter,* all of Wichita, were with him on the briefs for the appellants.

*Edward F. Arn,* of Wichita, argued the cause, and *Richard F. Mullins, Milo M. Unruh, William P. Timmerman* and *H. R. Kuhn,* all of Wichita, were with him on the briefs for the appellees.

The opinion of the court was delivered by

PRICE, J.: This was an action by lower riparian owners, through whose land flows Four-Mile Creek, to enjoin defendants from diverting and taking the water from a spring which is one of the sources of supply for the creek.

Defendants have appealed from an order granting to plaintiffs a temporary injunction.

Briefly stated, the over-all picture of the matter amounts to this:

Defendant Fisher is the owner of a farm upon which is located what is known as "Fisher Spring." It is not a "spring" in just the ordinary sense of the word, and from time immemorial has been the fountainhead of a stream known as the north fork of Four-Mile Creek. Plaintiffs are farmers through whose lands flows Four-Mile Creek, which is formed by the junction of the north and south forks. They used water from the creek for domestic purposes, the watering of livestock, and, to a limited extent, for irrigation. In October, 1952, defendant Beech Aircraft Corporation leased from Fisher a tract of four acres in the middle of which is located the spring in question. Under this lease Beech was granted the purported right to take and appropriate for its use the water from the spring upon payment to Fisher of $500 per year, and to provide him with a permanently full tank of stock water. Shortly thereafter Beech walled in the spring, erected a pump house and installed a pump, and constructed a three-mile long eight-inch pipeline from the spring to a "lake" adjacent to its aircraft plant. The water so piped has been used by Beech for industrial purposes and the amount taken has been substantially 150 million gallons per year.

Since the fall of 1952, when Beech commenced its pumping operations, the spring has not been permitted to flow into the channel of the north fork and that tributary of the creek became dry, thus depriving plaintiffs of water which otherwise would have flowed down the north fork into the creek and through their lands—hence this lawsuit for injunctive relief.

At the conclusion of the hearing below the court made findings of fact as follow:

"1. Plaintiffs are the owners of farm land through which passes the channel of Four-Mile Creek.

"2. 'Fisher Spring' is the main source of water supply for the north fork of the said Four-Mile Creek.

"3. The defendant Beech Aircraft Corporation, under a lease from the defendant G. M. Fisher, has had the exclusive use of the waters of said spring since 1952, except that said defendant corporation, under said lease, must furnish to said Fisher a full tank of stock water for the livestock of said Fisher.

"4. The defendant corporation, in 1952, constructed a pump house, and installed a pump with an intake from said spring, and built an 8-inch line carrying water from said spring to a lake contiguous to defendant corporation's

aircraft plant, which lake is used as one of the defendant's sources of water supply for industrial usage in its plant. This lake is not located within the natural watershed of the water from Four-Mile Creek's north fork nor from Fisher Spring.

"5. Defendant corporation failed to obtain a permit for use of the water from Fisher Spring or the north fork of Four-Mile Creek, from the Division of Water Resources of the Kansas Department of Agriculture.

"6. The plaintiffs had used for domestic and farm purposes the water from the north fork of Four-Mile Creek which flowed into Four-Mile Creek for many years, and continuously during said period of time said north fork of Four-Mile Creek was a flowing stream.

"7. Since the defendant corporation began to pump water from said spring in 1952, no water has flowed from the spring into the north fork of Four-Mile Creek and the said spring was not flowing at the time of the hearing in this case of plaintiffs' application for a temporary injunction.

"8. Defendants are making unreasonable use and diversion of the waters of Fisher Spring for industrial purposes.

"9. Plaintiffs have been deprived of the reasonable use of the waters from Four-Mile Creek originating from said spring, for domestic and farm use, including the watering of their livestock.

"10. Beginning in the year 1952, a serious drouth has existed covering all this portion of Kansas, but except for infrequent short periods of time, defendant corporation continued to pump water from said spring at an approximate rate during all of said time of 250 gallons per minute and was so pumping at the time of the above-mentioned hearing in this case.

"11. At the time of the hearing of the application for a temporary injunction in this case, local rains had furnished surface water which, in places, ran into Four-Mile Creek. The said Fisher Spring, however, was not flowing into the said north fork at the time of said hearing."

## As its conclusions of law the court held:

"1. Plaintiffs, as riparian owners of land through which waters of Four-Mile Creek from Fisher Spring had previously flowed, are entitled to a reasonable amount of such water, without unreasonable interference of others.

"2. The pumping to such an extent that Fisher Spring ceases to flow any water into the north fork of Four-Mile Creek constitutes an unlawful interference with plaintiffs' riparian rights and deprives plaintiffs of such rights.

"3. It is the ruling of the Court that plaintiffs are entitled to a temporary injunction as prayed for."

## The order of temporary injunction recites that defendants

". . . be and they are hereby enjoined, pending the final disposition of this action, from operating their divertments, dams, pumps and pipelines at the Fisher Spring on the North Fork of Four-Mile Creek located in the . . .; and from unreasonably using said spring water and from diverting it away from its normal channel and from using it for industrial uses and purposes."

Defendants immediately filed a supersedeas bond in the amount

of $10,000, and as a result the order of injunction has been stayed pending this appeal.

The specifications of error are that the trial court erred (1) in overruling defendants' demurrer to plaintiffs' evidence; (2) in that the findings of fact are not supported by competent evidence; (3) in that the findings of fact do not support the conclusions of law and require judgment in favor of defendants, and (4) in that the order of temporary injunction is contrary to law and is void.

Defendants first contend that finding number 2, to the effect that the spring in question is the main source of water supply for the north fork of the creek, is not supported by substantial, competent evidence. We do not feel called upon to debate the question and merely call attention to the fact that, despite evidence to the effect that the north fork naturally is replenished by drainage from rainfall, there was abundant testimony to establish that over a long period of years such tributary flowed with water from the spring and that such flow ceased when Beech commenced its pumping operations.

It also is contended there is no substantial, competent evidence to support finding number 6 with reference to plaintiffs' domestic and farm use of the water from the north fork which eventually flowed into the creek and through their lands. In our opinion this complaint is without merit, as disclosed by reference to the record.

It next is argued that finding number 8, to the effect that defendants are making unreasonable use and diversion of the waters of the spring for industrial purposes, is not supported by the record. This contention likewise cannot be sustained in the face of evidence showing the vast quantity of water taken by Beech, together with the fact it was established that the north fork had ceased to flow following commencement of the pumping operations. In fact, it was clearly established that Beech took *all* of the water flowing from the spring, which, as will be mentioned later, constituted an unreasonable use and diversion.

And, finally, it is contended that the record does not support finding number 9, to the effect plaintiffs have been deprived of the reasonable use of the waters from the creek, originating from the spring, for their domestic and farm use. In this connection it is argued that the real key to the performance of the spring lies in the lack of normal rainfall for the past several years in the area in question, and that irrespective of the diversion by Beech the spring, the north fork, and, in turn, the creek, would not now be

flowing because of severe drouth conditions, with which all, including this court, are familiar. In our opinion this contention somewhat begs the question and delves into the realm of speculation. Probably there is no doubt but that the flow of the spring has been affected by the lack of normal rainfall, but the fact remains that for the past several years Beech has taken *all* of the water from the spring, which, from the evidence, would otherwise have found its way through plaintiffs' lands.

At the hearing below much evidence, including expert testimony and numerous exhibits and statistics, was introduced. To discuss it in detail would serve no purpose other than unnecessarily to lengthen this opinion. We have examined the entire record in detail and are unable to say that the court's findings are not supported by substantial, competent evidence, and that the demurrer to plaintiffs' evidence was improperly overruled.

The next question presented is whether the findings support the judgment—in other words, was the trial court justified in granting the temporary injunction? In connection with this proposition defendants first contend for the application of the general rule that the remedy of injunction is only to afford preventive relief and is powerless to correct a past injury, citing, among other decisions, *Hurd v. Railway Co.*, 73 Kan. 83, 84 Pac. 553, and *Freeman v. Scherer*, 97 Kan. 184, 154 Pac. 1019, and that as the evidence showed that plaintiffs had ample water for all their uses *at the time of the hearing below* they were not entitled to injunctive relief. The facts establish that only a day or two before the hearing there was a four-inch flash rain in the immediate area which naturally caused the creek to flow and temporarily provided water for plaintiffs' use. One of the plaintiffs, in reply to a question as to "how he was fixed for water today," answered: "Anybody will be fixed pretty good after four inches of rain." The situation here clearly brings the matter outside the general rule, as is illustrated by the recent holding in *Huber v. Schmidt*, 180 Kan. 80, 299 P. 2d 33, in which a contention similar to that now made by defendants was answered adversely.

Defendants further argue that it was incumbent upon plaintiffs to establish that at the time relief was sought there was a spring on the Fisher property; that it was a fountainhead of a natural watercourse, and that plaintiffs were bound to establish an unreasonable use of the water emanating from it by defendants. Apparently a portion of this argument is based upon the fact that

at the time of the hearing below the spring was not flowing and had ceased to flow for a considerable period of time—therefore it cannot be said to be a spring. This argument overlooks the fact that it always had flowed prior to Beech's pumping operations, and the further fact that it is only reasonable to conclude that the reason it had ceased to flow into the north fork is because Beech had diverted and taken all of the water from it. A question also is raised concerning whether water coming from a spring is subject to the same rule relating to riparian users as pertains to a natural watershed where no spring is involved. The rule seems clear, however, that where, as here, a running stream is fed largely from a spring, the diversion of such water is subject to the general rules protecting riparian users of the stream. In this connection see *A. T. & S. F. Rld. Co. v. Long,* 46 Kan. 701, 27 Pac. 182, 26 Am. St. Rep. 165; Annotations at 55 A. L. R. 1385, p. 1501, and 109 A. L. R. 395, p. 416; and 56 Am. Jur., Waters, § 133, p. 612.

This brings us, then to the question whether it was established that defendants made an *unreasonable* use of the water from the spring. In view of the fact the evidence discloses that they used *all* of it—the matter is hardly open to debate. The doctrine of "reasonable use" which obtains in this state (*Clark v. Allaman,* 71 Kan. 206, 80 Pac. 571, 70 L. R. A. 971; *Railway Co. v. Shriver,* 101 Kan. 257, 166 Pac. 519; *Heise v. Schulz,* 167 Kan. 34, 204 P. 2d 706) simply means such use by one riparian owner as is consistent with the equal rights of other riparian owners. (See, also, 56 Am. Jur., Waters, § 13, p. 501, and § 274, p. 727.) In other words, plaintiffs, as lower riparian owners, possessed certain inherent rights in the water of the creek flowing through their lands. The action of defendants deprived them of such rights, and, under the facts and circumstances, the allowance of a temporary injunction enjoining defendants from unreasonably using water from the spring and diverting it away from its normal channel, and from using it for industrial uses and purposes, was fully justified.

In passing, we mention the fact that defendants had not applied for any appropriation rights from the division of water resources under the provisions of G. S. 1949, 82a-701, *et seq.*

And, finally, it is contended the temporary injunction order is contrary to law and void because it did not require plaintiffs to file a bond, as provided by G. S. 1949, 60-1110. On the date the

action was filed plaintiffs obtained an *ex parte* restraining order. That order required a bond in the amount of $1,000, which was filed. By agreement of counsel, however, operation of the temporary restraining order was stayed pending a hearing for a temporary injunction. At the time the temporary injunction was granted defendants announced their intention to appeal and immediately filed a supersedeas bond in the amount of $10,000. As a practical matter, therefore, neither the restraining order nor the temporary injunction has become *effective* as to defendants. We need not decide the purely academic question whether the bond given by plaintiffs at the time the restraining order was issued is still in effect. The mentioned statute (60-1110) provides that no injunction, unless otherwise provided by special statute, shall *operate* until the party obtaining the same shall give a bond. In any event, by virtue of proceedings heretofore related, the temporary injunction has not become *operative,* and, for the time being, at least, defendants' complaint in this connection is without merit.

It not appearing that the trial court erred in granting the temporary injunction, the judgment is affirmed.